[No. 71780-0.   En Banc.]
Argued June 3, 2004.     Decided June 16, 2005.

*In the Matter of the Personal Restraint of* Dwayne Woods,
*Petitioner.*

404

*Judith M. Mandel* and *Lenell R. Nussbaum,* for petitioner.

*Steven J. Tucker, Prosecuting Attorney for Spokane County,* and *Kevin M. Korsmo, Deputy,* for respondent.

¶1 ALEXANDER, C.J. — In 1997, a jury in Spokane County Superior Court found Dwayne Anthony Woods guilty of two counts of aggravated first degree murder, one count of attempted first degree murder, and one count of attempting to elude a police vehicle. Based on determinations made by that same jury, the trial court imposed the death penalty against Woods. This court affirmed the convictions and

sentence for two counts of aggravated first degree murder and one count of attempted first degree murder.[1] *State v. Woods*, 143 Wn.2d 561, 23 P.3d 1046 (2001). We now consider Woods' amended personal restraint petition, as well as numerous motions that Woods and the State filed during the pendency of this matter which we passed to the merits. We find that the issues Woods has raised to be without merit and, thus, deny Woods' amended personal restraint petition.

## I. FACTS AND PROCEDURAL HISTORY[2]

¶2 In his direct appeal, Woods raised many issues regarding the guilt and penalty phases of his trial. One of his main contentions on appeal was that the trial court erred in denying his trial counsel's motion for a continuance between the guilt and penalty phases of the trial in order to enable the attorneys to have his competency assessed. He noted that his trial attorneys had contended that his competency was called into question because he had instructed them to not present any mitigating evidence at the penalty phase of the trial. We rejected Woods' contention on the basis that there was no factual basis for the assertion that Woods was incompetent. *Woods*, 143 Wn.2d at 608. Woods' appellate counsel also argued that the trial court did not conduct a sufficient " 'colloquy' " with Woods to ensure that he " 'knowingly, voluntarily, and intelligently' " waived his right to present mitigating evidence at the penalty phase. *Id.* at 608, 609. We rejected that argument, as well as others, and affirmed Woods' convictions and the sentence of death.

¶3 Following conviction and sentence, counsel was appointed to prepare and file a personal restraint petition for Woods. Upon the filing of the petition on July 11, 2002, a stay of execution was granted. After Woods filed his per-

---

[1] On direct appeal, Woods did not challenge his conviction of attempting to elude a police vehicle.

[2] For a comprehensive recitation of the facts leading to the convictions, please refer to *State v. Woods*, 143 Wn.2d 561, 23 P.3d 1046 (2001).

sonal restraint petition, this court ordered a re-transcription of portions of the trial record. Following the re-transcription, Woods filed an amended personal restraint petition. The State then moved to strike all unverified claims from Woods' amended petition. We ultimately struck 7 of Woods' 18 claims based on his failure to verify these claims.

¶4 Woods has filed various motions, including motions for discovery, appointment of various experts, depositions of experts, and an evidentiary hearing. The State has also filed several motions. We have previously ruled on some motions and deferred ruling on seven others.[3]

## II. ISSUES

¶5 1. Whether Woods was denied due process, equal protection, his constitutional right to appeal, his right to counsel, and access to the courts because of the trial court's failure to provide a comprehensive trial record on appeal.

¶6 2. Whether Woods was denied due process, equal protection, access to the courts when the cost of hours of investigation and expenses incurred were not paid for at public expense.

¶7 3. Whether Woods was denied due process, a fair trial, and the right to an impartial and unbiased jury.

¶8 4. Whether Woods was denied a fair trial and the right of confrontation because the jury allegedly received extrinsic evidence.

---

[3] Among the motions filed by the State and passed to the merits was a "Motion to Strike Hearsay and Incompetent Evidence" from Woods' original personal restraint petition and amended personal restraint petition. We hereby grant the motion in part and strike the following portions of the record: Declaration of Louis Thompson at ¶¶13, 20; Declaration of Richard Wright at ¶¶6, 7; Declaration of Randall Thornburg at ¶¶6, 7. We deny the motion in all other respects.

Woods filed a "Motion to Strike," which was also passed to the merits. We grant the motion, in part, and strike the following portions of the record: Certificate of Lynnell McFarland at ¶6; Certificate of Randall Thornburg at ¶¶5, 6; and Certificate of Donald MacLaren at last sentence from ¶10. We deny this motion in all other respects.

¶9 5. Whether Woods was denied due process when he was allegedly seen in restraints by the jury.

¶10 6. Whether Woods was denied effective assistance of counsel at trial.

¶11 7. Whether Woods was denied his right to a jury trial when factual evidence was allegedly removed from the jury's consideration.

¶12 8. Whether Woods was denied due process when the State allegedly failed to reveal potentially exculpatory evidence to the defense.

¶13 9. Whether Woods is entitled to a new trial based on alleged newly discovered evidence of Dr. Brown's malfeasance in the state crime laboratory.

¶14 10. Whether Woods was denied due process, his right to be present, and to a public trial when certain proceedings were held in chambers and at sidebar without him.

¶15 11. Whether Woods was denied due process and protection against self-incrimination when the court allegedly admitted a compelled statement.

## III. ANALYSIS

### STANDARD OF REVIEW

■ ¶16 In order to prevail on a personal restraint petition, a petitioner must establish that there was a constitutional error that resulted in actual and substantial prejudice to the petitioner or that there was a nonconstitutional error that resulted in a fundamental defect which inherently results in a complete miscarriage of justice. *In re Pers. Restraint of Isadore*, 151 Wn.2d 294, 298, 88 P.3d 390 (2004). This threshold requirement is necessary to preserve the societal interest in finality, economy, and integrity of the trial process. It also recognizes that the petitioner has had an opportunity to obtain judicial review by appeal. We now turn to the claims raised by Woods in his amended petition.

### 1. COMPREHENSIVE TRIAL RECORD

¶17 Woods first contends that he was denied due process, equal protection, his constitutional right to appeal, his right to counsel, and access to the courts because of the trial court's failure to provide a comprehensive trial record on appeal. Woods asserts that because of this error this court should recall its mandate and reopen his direct appeal. Although Woods had earlier sought this relief by motion, he included this claim in his amended personal restraint petition because at the time the amended petition was filed, this court had yet to rule on the motion. Following the filing of the amended petition, we did, however, deny Woods' motion to recall mandate and reopen direct appeal. *See* Supreme Court Order (May 8, 2003). We are not inclined to revisit that decision.

■ ¶18 Although Woods' motion to recall mandate and reopen direct appeal was earlier denied, we recognize that, due to the incomplete transcription of the trial record, Woods was unable to raise certain issues in his direct appeal. Any prejudice that Woods may have suffered as a consequence of the incomplete transcription of the record on appeal, can, however, be mitigated by our application of the more lenient standard of review applicable to direct appeal to the new issues Woods discovered and raised following the re-transcription. *In re Pers. Restraint of Frampton*, 45 Wn. App. 554, 563, 726 P.2d 486 (1986) (in dicta, recognizing that a court reviewing a personal restraint petition may resolve appealable issues on the merits if the record were sufficient). Of the numerous issues that Woods has raised in his amended petition, we are of the view that only issue 10, relating to his right to be present at certain in-chambers and sidebar conferences between the trial court and counsel, warrants our review on the standard applicable to direct appeals.

### 2. FUNDING FOR INVESTIGATIVE SERVICES AND ATTORNEY FEES

¶19 Woods next claims that his right to due process was violated by this court's failure to order sufficient public

funding for certain expert and investigative services. Woods also contends that because these services were not fully funded, his right to equal protection was denied.

■■ ¶20 Due process protects against the deprivation of life, liberty, or property. U.S. CONST. amend. XIV, § 1; WASH. CONST. art. I, § 3. "The threshold question in any due process challenge is whether the challenger has been deprived of a protected interest in life, liberty or property." *In re Pers. Restraint of Cashaw*, 123 Wn.2d 138, 143, 866 P.2d 8 (1994). Aside from the due process clause, liberty interests may be created by statutes or regulations. *Id.* at 144.

■ ¶21 If a personal restraint petitioner requests, counsel will be appointed for his or her first personal restraint petition in a capital case provided he or she is found to be indigent. *See* RCW 10.73.150(3); RAP 16.25. No corollary statute mandates the provision of expert or investigative services at public expense. Such services are, however, to be afforded to a petitioner if he or she establishes that there is a substantial reason to believe that the services will produce information that would support relief. *See* RAP 16.26, 16.27. Absent the showing of a substantial reason for such services, provision of the services at public expense is not authorized. *See In re Pers. Restraint of Gentry*, 137 Wn.2d 378, 392, 972 P.2d 1250 (1999). There is no authority for "appointment of investigators or experts to identify or develop grounds for challenging convictions or sentences." *Id.*

¶22 At various times, Woods moved this court to authorize payment from the public purse for experts, investigators, and discovery. Woods claimed in support of these motions that it was necessary for him to depose certain employees of the state crime laboratory, conduct deoxyribonucleic acid (DNA) review, interview jurors and a witness, and fully investigate his ineffective assistance of counsel claim. We granted many of Woods' requests for services, including his request for additional payments for

the providers of these services.[4] Although we denied payment for some investigative services, we did so because, in our view, Woods failed to make the requisite showing that there was a substantial reason to believe that the additional services would provide information that would support relief.[5] *See* RAP 16.26, 16.27.

¶23 Woods' contention that his right to due process was violated because we did not order public payment for the costs of all of the requested expert and investigative services is without merit. We say this because Woods failed to make the requisite showing under RAP 16.26 and 16.27. Accordingly, no liberty interest was triggered.

¶24 Woods' equal protection claim also lacks merit. "Under the equal protection clause, persons similarly situated with respect to the purposes of the law must receive like treatment." *Gossett v. Farmers Ins. Co. of Wash.*, 133 Wn.2d 954, 979, 948 P.2d 1264 (1997) (citing *State v. Blilie*, 132 Wn.2d 484, 493, 939 P.2d 691 (1997)). Woods asserts that if public funding for expert and investigative services is not provided to him, his right to equal protection is violated because he is not afforded the same rights as a nonindigent petitioner. Again we observe that Woods has not been denied the services of experts and investigators. Indeed, as noted above, this court has authorized payment from the public purse for the costs of substantial investigative services. The mere fact that some of his requests for services were denied does not establish an equal protection violation. In our view, the rules of appellate procedure provide a standard for determining when public funds may

---

[4] We granted Woods' request to appoint a nonattorney expert to aid in the preparation of his personal restraint petition. We also authorized expenditure of public funds for that service. Additionally, we granted five separate motions by Woods, which collectively authorized payment for 73.5 hours of investigative assistance. The total payments for the aforementioned services were approximately $5,000. On May 12, 2004, Woods filed an additional motion for authorization and payment for 10 additional hours of investigative services. That motion was passed to the merits and it is hereby granted.

[5] The following requests for investigative services were denied by this court: (1) appointment of mitigation expert, (2) appointment of DNA expert, and (3) authorization of 100 hours of investigative services to explore Woods' juror misconduct and ineffective assistance of counsel claims.

be expended for investigative and expert services for indigent petitioners, and that standard has been observed.

¶25 In sum, Woods has not shown that his due process and equal protection rights were violated by the denial of some of his requests for funds for investigative and expert services.

¶26 Finally, Woods seeks additional payment for his attorneys for time they worked to complete and file his amended personal restraint petition. Although we previously denied a similar motion on May 8, 2003, we consider this request for additional attorney fees as essentially a motion for reconsideration. Woods contends that his attorneys "should be paid . . . for all the work [they] had to do again." Amended Personal Restraint Petition (Am. Pet.) at 61. The principal flaw in this argument is that it ignores the fact that this court authorized payment to Woods' attorneys for a specific number of hours in which to prepare the amended personal restraint petition. Significantly, we authorized payment for 160 hours of preparation time for each of Woods' two attorneys, a total of 320 attorney hours, to prepare and file the amended petition within 30 days.[6] Woods, through counsel, indicated that the attorneys would not be able to complete this task on time and moved for additional time to complete the task. Although we granted Woods' motion for additional time, we did not authorize payment for the 238 additional hours of time they estimated would be necessary to complete the amended petition. In our view, the previously authorized 320 hours of attorney time was sufficient to allow completion of the

---

[6] In addition to authorizing payment for 320 hours to prepare the amended petition, Woods' attorneys were granted payment for 222 attorney hours (111 for each attorney) to review the re-transcribed record and payment for a paralegal to review 132 hours of trial video and alert Woods' attorneys regarding any discrepancies between the original and re-transcribed record. *See* Decl. of Lenell Nussbaum in Supp. of Pet'r's Second Mot. to Continue Due Date for Am. Pet. at App. A-D.

amended petition and, thus, we are not inclined to authorize additional payment.[7]

### 3. IMPARTIAL AND UNBIASED JURY

¶27 Woods alleges misconduct during the course of the trial by two alternate jurors. Essentially he contends that the alternate jurors engaged in unauthorized communication. Woods requests that this court order a reference hearing in order to resolve the juror misconduct allegations. Because we find this claim to be without merit, we deny the request for a reference hearing.

¶28 On direct appeal, when an unauthorized jury communication is found to have taken place, it is the State's burden to prove harmlessness beyond a reasonable doubt. *Remmer v. United States*, 347 U.S. 227, 229, 74 S. Ct. 450, 98 L. Ed. 654 (1954); *State v. Kell*, 101 Wn. App. 619, 621, 5 P.3d 47 (2000). Although Woods could have made this claim on direct appeal, he did not do so. Because a personal restraint petition involves a collateral review, we have held that "the petitioner has the burden of establishing the claimed error more likely than not caused actual prejudice." *Gentry*, 137 Wn.2d at 409. This " 'more likely than not' standard is equivalent to preponderance of the evidence." *Id.*

¶29 The first claim of juror misconduct involves alternate juror, Lynnell McFarland, who allegedly made out-of-court statements to others. The trial court was made aware of the alleged misconduct during trial when it received an anonymous phone call, in which the caller stated that "they wanted to say something about the juror talking about the case." Verbatim Report of Proceedings (VRP) at 3827. However, the caller hung up without leaving a name or phone number. The caller made a second call to the trial court and left a message that contained sufficient informa-

---

[7] It is worth noting that the payments to Woods' attorneys are not inconsiderable. The record shows that they were paid $113,107 to prepare the personal restraint petition and an additional $51,212 to prepare the amended personal restraint petition.

tion so that the juror in question could be identified.[8] In this message, the caller stated that McFarland had discussed the case with McFarland's husband, who in turn, made comments to the caller's family that the defendant did "not have a chance" because of "the number of females on this jury. And they're all white, and he's a black man."[9] *Id.* at 3954.

¶30 Based on the receipt of this information, McFarland was to be brought into chambers for questioning before the trial judge, prosecuting attorney, and defense counsel. Woods was not present during this questioning. In response to the questioning, alternate juror McFarland denied having discussed the case with her husband. Although given an opportunity to question the alternate juror, the attorneys did not ask her any questions. The trial judge then instructed McFarland not to mention the incident to other jurors. Woods' attorney did not pursue the matter any further at trial.

¶31 The second claim of juror misconduct involved alternate juror, Randle Riddle. During the late stages of the guilt phase of the trial, two jurors complained to the bailiff about the attitude and actions of Riddle. The complaining jurors were brought in for questioning separately before the trial judge, prosecuting attorney, and defense counsel. Woods was not present during this questioning and his attorney stated to the trial judge that he did not think it was necessary for Woods to be present. The jurors indicated, in response to questioning, that Riddle was (1) not taking the case seriously, (2) not keeping the case confidential, and (3) using inappropriate language. Woods' attorney indicated that "I don't think there's a problem" with Riddle. VRP at 4342. The trial court did not remove Riddle as an alternate juror.

---

[8] The caller stated that the juror was a nurse, in her early forties, and married. These facts made it possible for the court and the attorneys to identify McFarland as the juror in question.

[9] Woods is African-American.

¶32 Woods' trial concluded the following day. All alternate jurors, including McFarland and Riddle, were excused and did not participate in reaching verdicts at either the guilt or sentence phase of the trial.

¶33 In our view, these claims of juror misconduct are meritless. We reach that conclusion because we are satisfied that Woods has not proved actual or substantial harm. The allegations involved alternate jurors who were ultimately excused from deliberating on the case. Therefore, we cannot say that Woods was denied a fair and impartial jury even if the allegations against each alternate juror were true.

*Woods' Motion for Deposition and for Protective Order*

¶34 Woods requests an order from this court allowing him to take the deposition of the person who allegedly made the anonymous phone calls regarding alternate juror Lynnell McFarland. This, according to Woods, would allow him to investigate the juror misconduct claim further. Woods also seeks a protective order for the person he would depose because of that person's alleged fear of the McFarlands.

¶35 As indicated above, the alleged misconduct of the two alternate jurors did not cause prejudice to Woods. Therefore, a deposition would serve no purpose. The motion, therefore, is denied.

### 4. JURY RECEIVING EXTRINSIC EVIDENCE

¶36 Woods claims that he was denied a fair trial and the right of confrontation when the trial court denied his pretrial motion to have the victims' family members remove black and orange remembrance ribbons while in the courtroom. Woods argues that the presence of these ribbons constituted extrinsic evidence of victim impact that could not be challenged at trial.

¶37 During jury voir dire, Woods asked the trial court to order the spectators to remove the ribbons from their

persons. Outside of the presence of the jury pool, the trial court asked for comment from some of the spectators who were wearing the ribbons. One stated that it is "[j]ust representative of my daughter and the tragedy that has taken place." VRP at 570. After the questioning of some of the spectators, the trial court declined to order removal of the ribbons. The trial court did, however, state that if it were necessary at some time to give a jury instruction regarding the ribbons, then it would give such an instruction.

¶38 A defendant has a fundamental right to a fair trial. U.S. CONST. amends. VI, XIV, § 1. When a courtroom arrangement is challenged as inherently prejudicial, the question to be answered is whether an unacceptable risk is presented of impermissible factors coming into play. *Holbrook v. Flynn*, 475 U.S. 560, 570, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986). In other words, all a court may do in such a situation is to look at the courtroom scene presented to the jury and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to the defendant's right to a fair trial. *Id.* at 572.

¶39 In support of his claim, Woods relies on *Norris v. Risley*, 918 F.2d 828 (9th Cir. 1990). In *Norris*, the Ninth Circuit Court of Appeals concluded that because women spectators were wearing buttons inscribed with "Women Against Rape" the defendant was deprived of a fair trial. It reached this conclusion because the buttons announced the spectators' conclusion about the defendant's guilt and amounted to "unacceptable risk of . . . impermissible factors" coming into play. *Id.* at 834. The present circumstance, in our judgment, is distinguishable from *Norris*. Here, the black and orange ribbons did not contain any inscription. They were simply ribbons that the wearers indicated they wore in memory of the victims. In examining a color copy of the ribbon, it is our view that they do not express any conclusion about Woods' guilt or innocence.

¶40 Furthermore, the record shows that Woods never sought a cautionary jury instruction from the trial court.

There is also nothing in the record to suggest that any juror was influenced by the fact that the ribbons were worn by the family of the victims. In fact, juror Randall Thornburg stated in a declaration that he understood that the wearing of the ribbons was a "sign of their mourning their loss of a daughter or loved one. It was something like a football team wearing an armband when a teammate has died." Decl. of Randall Thornburg at 2. In a certificate, Thornburg clarified his statements in his declaration and stated, "I thought the ribbons were nice, but they did not influence my decision or that of the other jurors." Certificate of Randall Thornburg at 1.

¶41 Many courts have used the *Holbrook* standard and have found that no inherent prejudice exists so as to taint the defendant's right to fair trial from the wearing of buttons or other displays. *See, e.g., Buckner v. State*, 714 So. 2d 384, 389 (Fla. 1998) (spectators holding up victim's picture was not inherently prejudicial); *Pachl v. Zenon*, 145 Or. App. 350, 929 P.2d 1088, 1093 (1996) (spectators wearing buttons with inscription "Crime Victims United" was not prejudicial and counsel was not ineffective for failing to challenge the issue); *State v. Braxton*, 344 N.C. 702, 477 S.E.2d 172, 177 (1996) (spectators wearing badges with victim's picture on them was not prejudicial). In most cases involving violent crime, there is at least one grieving family present at the trial and the presence of such persons should not come as any surprise to the jury members. *See, e.g., State v. Richey*, 171 W. Va. 342, 298 S.E.2d 879, 889 (1982) ("We must assume that a jury has the fortitude to withstand this type of public scrutiny, and cannot presume irreparable harm to the defendant's right to a fair jury trial by the presence of spectators who may have some type of associational identity with the victim of the crime."). We conclude, in sum, that Woods does not meet the burden of proving that his right to a fair trial was prejudiced by the trial court's action in allowing members of the victims' families to wear the black and orange ribbons in the courtroom.

## 5. WOODS IN RESTRAINTS

¶42 Woods claims that he was denied due process because the jury allegedly saw him in restraints in the courtroom. We recognize that it is well settled law that "a prisoner is entitled to be brought into the presence of the court free from restraints." *State v. Damon*, 144 Wn.2d 686, 690, 25 P.3d 418, 33 P.3d 735 (2001); *Corley v. Cardwell*, 544 F.2d 349, 352 (9th Cir. 1976); *State v. Williams*, 18 Wash. 47, 50, 51, 50 P. 580 (1897) (if defendant remains in restraints, " 'the jury must necessarily conceive a prejudice against the accused, as being in the opinion of the judge a dangerous man, and one not to be trusted, even under the surveillance of officers' " (quoting *State v. Kring*, 64 Mo. 591 (1877))). Restraints are to " 'be used only when necessary to prevent injury to those in the courtroom, to prevent disorderly conduct at trial, or to prevent an escape.' " *Damon*, 144 Wn.2d at 691 (quoting *State v. Hartzog*, 96 Wn.2d 383, 398, 635 P.2d 694 (1981)).

¶43 In examining the record, we do not find any factual support for Woods' claim that the jury saw him in restraints in the courtroom during the course of the trial. Woods bases his claim in this regard entirely on the declaration of juror Thornburg. In his declaration, Thornburg stated, "I remember seeing Mr. Woods in handcuffs twice when they took him out of the courtroom." Decl. of Randall Thornburg at 1. However, in a latter certificate, Thornburg clarified his statements and attested that

> The Declaration states that I twice saw Dwayne Woods transported in handcuffs when he left the courtroom. That is not correct. I explained to the attorneys on the telephone that I saw some television footage of the trial after it was completed and noticed that he was transported in handcuffs. It was no big deal to me to see that on television. I never at any time saw him in restraints during my service as a juror. I never heard any other juror mention anything about restraints either. Mr. Woods was always in the courtroom when the jury entered and left. We never saw him transported to or from the courtroom.

Certificate of Randall Thornburg at 1. In light of Thornburg's certificate, Woods' reliance on the earlier declaration is unwarranted. There is, in short, nothing in the record to support a conclusion that the jury saw Woods in restraints in the courtroom. Indeed, it appears that great pains were taken to make sure that Woods was never restrained in the presence of the jury. In fact, certificates provided to the court suggest that all restraints were removed from Woods when he arrived in the courtroom before the jury was seated. *See* Certificate of John F. Driscoll, Jr. (Spokane County Prosecutor Chief Criminal Deputy) at 1; Certificate of Mark Henderson (Spokane County Sheriff Detective) at 1; Certificate of Thomas Warner (Spokane County Deputy Sheriff) at 1. These certificates also suggest that restraints were not placed on Woods until the jury had retired to the jury room. While restraints were used on Woods during transport, this was not in the presence of jurors. Certificate of Thomas Warner at 1. There is no merit to this claim.

### 6. INEFFECTIVE ASSISTANCE OF COUNSEL

¶44 Woods asserts that he received ineffective assistance of counsel during his trial proceedings. Woods prefaces this claim by stating that his trial attorneys lacked proper training to handle capital cases, were unprepared and disorganized, and were overburdened because they possessed heavy caseloads and could not fully concentrate on Woods' case. He also indicates that his investigator was overburdened and possessed no training or expertise.

¶45 Effective assistance of counsel is guaranteed by both the federal and state constitutions. *See* U.S. CONST. amend VI; WASH. CONST. art. I, § 22. To prove ineffective assistance of counsel, the petitioner must first show deficient performance. *State v. Hendrickson*, 129 Wn.2d 61, 77, 917 P.2d 563 (1996). "Deficient performance is not shown by matters that go to trial strategy or tactics." *Id.* at 77-78. The petitioner must also show prejudice " 'that

counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' " *Id.* at 78 (quoting *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). This second element is proved "when there is a reasonable probability that, but for counsel's errors, the result of the trial would have been different." *Id.* at 78. If either part of this test is not met, the claim fails. Because of the large number of issues within this claim, we will first deal with Woods' claims of ineffective assistance of counsel during the guilt phase. We will then discuss the claim as it relates to the sentencing phase.

### Guilt Phase

¶46 Woods claims that his trial attorneys should have investigated and pursued a diminished capacity defense based on what he claims was his heavy drug usage. If established, Woods argues, this defense might have precluded a jury finding that he premeditatedly committed the murders. Woods states that instead of pursuing this line of defense, his attorneys chose instead to follow the "weak alibi" defense. Am. Pet. at 100. There is nothing in the record to show that Woods' attorneys were not aware of this potential defense and declined to present it. From a tactical standpoint, we believe it was reasonable for his counsel to pursue the alibi defense rather than diminished capacity because Woods continuously denied his involvement in the crimes. To pursue the diminished capacity defense would have required Woods to essentially admit that he committed the murders, a position entirely inconsistent with his contention that he did not commit the murders. Woods, in short, does not provide any persuasive evidence that his trial attorneys were deficient in not presenting a diminished capacity defense.

¶47 In *Douglas v. Woodford*, 316 F.3d 1079, 1086 (9th Cir. 2003), the defendant claimed that his attorney failed to uncover evidence of a prior mental health evaluation that suggested the defendant suffered from serious

mental problems that would have made him incompetent to stand trial. The Ninth Circuit concluded that the attorney's failure to discover the past mental health evaluation was harmless as to the guilt phase in light of the evidence of defendant's planning and deliberation of the crime. *Id.* at 1087. Here the same could be said. Even if Woods' attorneys failed to investigate the diminished capacity defense, it is harmless error because there is strong evidence of premeditation by Woods. For example, Woods had serially attacked the three victims over a period of several hours and he bound two of them before administering the beatings. *Woods*, 143 Wn.2d at 569-73. Furthermore, he was also able to escape after being found, got a ride to downtown Spokane, and was able to access a cash machine account after obtaining one of the victim's personal identification number.

¶48 Woods claims that his attorneys were not prepared to impeach witness Johnny Knight with a prior theft conviction. He argues that his attorneys "failed to obtain a certified copy of a judgment and conviction showing that Mr. Knight committed a crime of dishonesty," a fact admissible as impeachment evidence, under ER 609. Am. Pet. at 121. Thus, according to Woods, when Knight denied the conviction on the stand, his trial attorneys were unprepared. However, the failure to obtain the certified copy of judgment and conviction does not establish deficiency. We say that because questioning from the prosecution and defense established that all parties were aware that Knight had a theft conviction.[10] In fact during questioning, Knight volunteered information about other convictions as well. Thus, it is clear that the jury was aware they were listening to a witness with multiple convictions. In effect, Knight impeached himself.

---

[10] "[Prosecuting Attorney:] Okay. Mr. Knight, you've been convicted before in 1990 of theft, is that correct?" VRP at 4006. "[Defense Counsel:] All right. And let me talk with you first about your past conviction. You said you don't recall being convicted of theft in 1990?" VRP at 4020. "[Defense Counsel:] Well, do you recall being convicted—I don't have the particulars, but do you recall that theft conviction at least in 1990?" VRP at 4021.

¶49 Woods also argues that his trial attorneys failed to request that his aliases be removed from certain pleadings. More specifically, Woods claims that the inclusion of the alias, "Michael Smith," was irrelevant and prejudicial. In *State v. Elmore*, 139 Wn.2d 250, 283-84, 985 P.2d 289 (1999), we dealt with the use of an alias and upheld its use during trial when it was shown that it was the name some of the witnesses knew him by. In deciding *Elmore*, we utilized the alias standard set forth in *State v. Cartwright*, 76 Wn.2d 259, 456 P.2d 340 (1969). The test as to whether an alias may be used by the State is whether the alias or other name is relevant and material to prove or disprove any of the issues in the case. *Elmore*, 139 Wn.2d at 284.

¶50 There was, in our judgment, no error in using the alias "Michael Smith." That is so because the identity of the perpetrator was at issue. Woods was booked at the jail under the name "Michael Smith." VRP at 3600. The two fingerprints that were removed from the crime scene came up as belonging to "Michael Smith" (alias for Dwayne Woods). VRP at 3603-04. It was, therefore, necessary to use the alias during the trial because some of the evidence tying Woods to the crime scene required the reference to his alias. Furthermore, during the guilt phase of the trial, Woods' attorneys challenged the foundation of the fingerprint records. To establish the foundation, it was necessary for the record custodian to reference "Michael Smith" during her testimony regarding the creation and maintenance of the fingerprint records. The prosecutors, therefore, had no choice but to include his alias in the caption of the pleadings because it was necessary to identify Woods as the perpetrator. Thus, there was no deficiency in the trial attorneys' failure to remove Woods' alias from court pleadings.

¶51 Finally, Woods claims that his trial attorneys failed to seek the dismissal of one of the aggravating factors alleged in the murder of Telisha Shaver. The aggravating factor was that the killing occurred in the course of a rape. Woods argues that this aggravating factor should not have

been included because he did not rape Telisha Shaver. However, the inclusion of this factor was valid.

¶52 RCW 10.95.020(11)(b) allows for an aggravating circumstance if "[t]he murder was committed in the course of, in furtherance of, or in immediate flight from . . . Rape in the first or second degree." The prosecutors never argued that Woods raped Telisha Shaver before he killed her. Their argument, rather, was that Woods raped Jade Moore and killed Telisha Shaver, in part, to facilitate his escape from the crime of raping Jade Moore. The prosecution never presented evidence that Woods also raped Telisha Shaver, and the jury was never led to believe so. Therefore, the inclusion of this aggravating factor is valid. Thus, Woods' trial attorneys were not ineffective for failing to dismiss this aggravating factor. As a matter of law, there was no basis for dismissing the factor. The process to dismiss prosecution, as established in *State v. Knapstad*, 107 Wn.2d 346, 729 P.2d 48 (1986), is not applicable to aggravating factors alleged in murder prosecutions. *See State v. Brown*, 64 Wn. App. 606, 616 n.9, 825 P.2d 350 (1992) (dismissal of aggravating factors before the conclusion of trial should not be treated the same as dismissal of prosecution).

### Penalty Phase

¶53 Woods claims that his trial attorneys failed to develop and present a mitigation case during the penalty phase. More specifically Woods points to his trial attorneys failing to (1) find out about "family love," (2) show "exemplary behavior" in prison, and (3) introduce evidence even over Woods' objections to do so.

¶54 For support, Woods relies mostly on cases where there was almost no work done in developing mitigation. *See, e.g., Silva v. Woodford*, 279 F.3d 825, 838-40 (9th Cir. 2002) (attorney refused to investigate mitigating factors because there was a threat of misbehavior from defendant); *Williams v. Taylor*, 529 U.S. 362, 395-96, 120 S. Ct. 1495,

146 L. Ed. 2d 389 (2000) (investigation for mitigation began one week before trial; there was no effort of attorney to seek records the attorney erroneously believed to be inadmissible). It is not the case here that Woods' counsel did not investigate mitigation. Although Woods' attorneys did not include in the record what evidence they would have presented in mitigation, there is some evidence that investigation and work was done on mitigation. *See* VRP at 4534-35 (Woods' attorney, James Sheehan: "[D]efense will not be presenting any mitigation. . . . [W]e would have called Dwayne's parents, Janet and Emmanuel Hunter, his sister, Beverly Thompson, his nephew, Willy Lyons. And then there would have been Dr. Amy Paris, from Spokane, Dr. Muriel Leesack, from Portland, and Annie Cowles, from Spokane. . . . Dwayne, it's my understanding, does not want us to put on any witnesses.").

¶55 A declaration by one of Woods' trial attorneys, Richard Fasy, establishes that he did reach out to family members regarding the penalty phase. *See* Decl. of Richard Fasy at 3. However, the family members contacted by Fasy were unresponsive and did not cooperate.

¶56 We also cannot conclude that the trial attorneys were ineffective in not presenting evidence of Woods' alleged exemplary behavior in prison. Even if Woods had given them permission to present the evidence, there may have been tactical reasons for them to not present it. The State has said that if Woods' behavior in prison would have been presented, they would refute his exemplary behavior. *See* Answer to Personal Restraint Pet. & Br. of Resp't at App. A at 2 (Woods "picked up at least three infraction notices. It was also learned that he and another prisoner were believed to be plotting an escape attempt.").

¶57 In his direct appeal, we held that Woods waived his right to present mitigating evidence during the sentencing phase. *Woods*, 143 Wn.2d at 609-10. The failure of Woods' attorneys to put forth mitigation was, thus, due to Woods' refusal to allow them to present such evidence. This case is similar to *In re Personal Restraint of Jeffries*, 110 Wn.2d

326, 331, 752 P.2d 1338 (1988), where the defendant did not want any witnesses to testify at the penalty phase. The attorneys abided by the defendant's wishes and did not put forth mitigation evidence. This court held that the defendant made his decision to not call witnesses "knowingly, voluntarily, and intelligently." *Id.* at 334. Furthermore, the trial attorneys exercised "reasonable professional judgment" by abiding by their client's wishes. *Id.*

¶58 In sum, the defense attorneys were ready to put forth evidence in mitigation but did not do so because Woods' steadfastly objected to the presentation of this evidence. In light of Woods' objections, his trial attorneys exercised reasonable professional judgment in not putting forth such mitigation evidence. Therefore, they were not deficient in their performance.[11]

## 7. FACTUAL EVIDENCE REMOVED FROM JURY'S CONSIDERATION

¶59 Woods claims that the trial court erred in withdrawing evidence from the jury's consideration. The "evidence" in question is five autoradiograms (autorads) that were used by Dr. John Brown, a witness for the State, during his testimony at trial. The autorads helped illustrate Dr. Brown's testimony regarding DNA. They were shown to the jury through a projector.

¶60 During deliberations, the jury asked to see the autorads. The trial court denied their request on the basis that the autorads were used only for illustrative or demonstrative purposes. Neither the prosecuting attorney nor Woods' counsel objected to this ruling and both worked with the trial court in crafting a response to the jury.

¶61 "The use of demonstrative or illustrative evidence is to be favored and the trial court is given wide latitude in determining whether or not to admit demonstrative evidence." *State v. Lord*, 117 Wn.2d 829, 855, 822 P.2d

---

[11] Because we find Woods' claim of ineffective assistance of counsel meritless, we deny his motion to compel depositions of trial attorneys and motion for order for production and inspection of documents.

177 (1991). However, when an exhibit is used for illustrative purposes only and the jurors are instructed that the exhibit is not evidence, then the exhibit should not go to the jury room. *Id.* at 856. The illustrative exhibit should be used only "during the initial presentation of testimony and/or in final argument by counsel." *Id.* at 856-57.

¶62 The report of proceedings clearly shows that the autorads, identified as exhibits 225-29, were used for illustrative or demonstrative purposes only. The following exchanges occurred during the trial:

> [Prosecuting Attorney:] Sir, can you identify State's Exhibit for demonstrative purposes number 225?
>
> [Dr. Brown:] Yes. This is a copy of one of the—the autoradiograms that I developed during my testing in this—this instance, in this case.
>
> [Prosecuting Attorney:] Okay.
>
> The Court: Just before you turn that on, counsel, is there any objection to this being used in this fashion.
>
> Mr. Leatherman [Woods' attorney]: No, Your honor.
>
> The Court: All right.
>
> Mr. Leatherman: For demonstrative purposes.
>
> The Court: Of course.

VRP at 3856-57. A similar colloquy occurred for the submission of exhibit 226:

> [Prosecuting Attorney:] Now to demonstrate what we're talking about, about inconclusive probes, would it aid for you to use an autoradiograph?
>
> [Dr. Brown:] I think it would be a great aid, yes.
>
> [Prosecuting Attorney:] Handing you what's been marked State's Exhibit 226, can you identify that?
>
> [Dr. Brown:] This is the second of the tests I had run on this—these particular samples. And this—this is one in which I deemed to be inconclusive.
>
> [Prosecuting Attorney:] For demonstrative—Just for demonstrative purposes, Your Honor.

The Court: Did you offer the other for demonstrative purposes as well?

[Prosecuting Attorney:] Yes, Your Honor, just for demonstrative.

The Court: And again based on what we stated earlier, it will be admitted for demonstrative purposes with respect to this?

Mr. Fasy [Woods' attorney]: No objection if it's being used for demonstrative purposes.

The Court: It is admitted for demonstrative purposes only.

VRP at 3864-65. Woods' attorney also submitted autorad exhibits (numbers 227, 228, and 229) for demonstrative purposes only. The dialogue that occurred in connection with the autorads submitted by Woods was similar. *See* VRP at 3895-96. The above exchanges clearly show that the autorads were submitted for demonstrative purposes only. Therefore, the trial court was correct in declining to allow the exhibits to be admitted to the jury room for consideration. Woods' claim that the jury should have been given the exhibits to be considered during deliberation is without merit.

### 8. EXCULPATORY EVIDENCE

¶63 Woods claims that exculpatory evidence was withheld from him at his trial. He asserts that this evidence would have permitted his defense team to impeach State's witnesses Dr. John Brown and Pearl Brown.

¶64 "To comport with due process, the prosecution has a duty to disclose material exculpatory evidence to the defense and a related duty to preserve such evidence for use by the defense." *State v. Wittenbarger*, 124 Wn.2d 467, 475, 880 P.2d 517 (1994); *see also Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Evidence is material and therefore must be disclosed if there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Gentry*, 137 Wn.2d at 396; *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481

(1985). The question to be answered is not whether the defendant would more likely than not have received a different verdict with the evidence but whether the absence of the evidence undermines confidence in the verdict. *Gentry*, 137 Wn.2d at 396 (quoting *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995)). The destruction of evidence offends due process if the evidence was materially exculpatory and was destroyed in bad faith. *State v. Straka*, 116 Wn.2d 859, 884, 810 P.2d 888 (1991).

¶65 With respect to Dr. Brown, the alleged exculpatory evidence is that Dr. Brown and the Washington State Crime Laboratory had a policy of destroying evidence that should have been disclosed. Woods claims that Dr. Brown was destroying tests that he conducted that may have reached a different conclusion than the one presented at trial and was lying about doing so. Although Woods makes this claim, he does not provide support for it. In short, the record does not show that Dr. Brown intentionally destroyed exculpatory evidence and then lied about it. Donald MacLaren, who was the supervisor of the DNA section within the Washington State Patrol Crime Laboratory and Dr. Brown's supervisor, indicated in his certified statement that he did a peer review of Dr. Brown's work for this case and agreed with Dr. Brown's conclusions. Certificate of Donald MacLaren at 2.

¶66 MacLaren also gave a statement as to how the crime laboratory operated under his management. An initial test result of the analyst would be treated as a draft report until peer review was completed and the results were agreed upon. Certificate of Donald MacLaren at 1. If the results were agreed upon, it was the policy of the crime laboratory to retain only the final, reviewed report. All preliminary drafts of reports were discarded. Also, if the reviewing analyst disagreed with the original analysis, the two analysts would consult and resolve the discrepancies.

¶67 Woods claims that in a previous case, *State v. Barfield*, King County Superior Court No. 98-1-02618-5 (Jan. 23, 2001), Dr. Brown had done an initial test and concluded that the DNA found in the rape victim did not

match the defendant's. Am. Pet. at 169. However, after peer review, Dr. Brown did the test over and concluded that it did match. Using this case, Woods attempts to establish that Dr. Brown was in the habit of destroying evidence and lying about it. However, under the standards of the crime laboratory, as established by MacLaren, Dr. Brown's actions comport with the policies. As stated by MacLaren, only the final result was retained and other drafts of the tests are not usually maintained.

¶68 Woods asserts that Dr. Brown destroyed other test results in his case. However, as stated before, drafts of reports that are not final are often discarded. Furthermore, during peer review, MacLaren agreed with Dr. Brown's test results and the conclusions he reached. There is, in short, no evidence in the record to show that Dr. Brown acted in bad faith in destroying drafts of reports. Any drafts of reports cannot be considered exculpatory evidence because only final reports are maintained and submitted as the official findings. Therefore, we conclude that no exculpatory evidence was withheld by the State because the discarding of drafts of reports does not amount to *Brady* evidence.

¶69 The claim with respect to Pearl Brown is that the State should have disclosed that Ms. Brown was being investigated by the Spokane Police Department and Child Protective Services at the time of Woods' trial. Brown, who is the mother of Woods' daughter, was called by the State to testify that two items of clothing in evidence belonged to Woods. In his personal restraint petition, Woods implies that Pearl Brown cooperated with the State in order to not lose her children and/or avoid charges. He insinuates that by testifying for the State, Brown's criminal charges were dismissed. He argues that he should have been given the information on Brown for impeachment purposes. Woods makes these assertions without providing any factual support for them.

¶70 Furthermore, the possible impeachment of Brown does not meet the *Brady* standard. As stated above, material evidence must be disclosed if there is a reasonable

probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different. Brown was brought in as State's witness to identify two articles of clothing that belonged to Woods. Had Woods impeached Brown during the trial, the outcome of the trial would not have been different. We say that because the articles of clothing Brown identified were admitted into evidence without objections. Woods never contended that the clothing was not his, so impeachment of Brown would have been a futile act. Woods fails to establish that exculpatory evidence regarding Dr. John Brown and Pearl Brown was withheld from him.[12]

### 9. Dr. Brown's Malfeasance in the Criminal Laboratory

¶71 Woods claims that he is entitled to a new trial based on newly discovered evidence of alleged malfeasance in the crime lab by Dr. Brown. This contention stems from Dr. Brown's acknowledgement that he intentionally made misleading statements in another criminal proceeding, *State v. Barfield*, noted at 118 Wn. App. 1036 (2003). *See* Woods' Reply Br. at App. A at 6 (In his oral statement to the Washington State Patrol Internal Affairs, Dr. Brown attested that he made untruthful statements to the defense attorneys in the *Barfield* case in order to mislead them about the DNA testing he conducted.).

¶72 Woods cites *State v. Roche*, 114 Wn. App. 424, 59 P.3d 682 (2002) as support for his claim that he is entitled to a new trial. In *Roche*, a chemist for the Everett crime laboratory self-medicated with heroin that was sent to the crime lab to be tested. The chemist was found to have stolen some of the drug samples he was supposed to test. He also used the drugs while he was on the job and lied about his activities. The Court of Appeals found that the chemist's malfeasance broke the chain of custody and tainted the

---

[12] Because we conclude that Woods failed to establish this claim and that a reference hearing is unnecessary, we deny his motion for depositions of Dr. John Brown, Donald MacLaren, and William Morig. We also deny the State's motion to compel discovery of DNA testing.

integrity of the defendants' trials. Consequently, it granted new trials to the defendants.

¶73 *Roche* is distinguishable from the instant case. There is no evidence here that any evidence was destroyed in bad faith or was the subject of tampering. At most, Woods has established that Dr. Brown lied during an interview with the defense in the *Barfield* case and then rectified the situation by acknowledging the lie. Although, Woods' repeatedly claims that Dr. Brown willfully destroyed evidence relating to the case and lied about it, he offers no evidence to support this assertion. Furthermore, Donald MacLaren, Dr. Brown's supervisor at the time of Woods' trial, stated that he agreed with Dr. Brown's analysis and conclusions after peer review of Dr. Brown's work in Woods' case. Unlike the chemist in *Roche*, Dr. Brown's scientific skills and his quality of work have never been called into question. The context surrounding Dr. Brown's problems in the *Barfield* case is that he misled the defense team about why he revised his draft of report of his analysis in that case.

### 10. Proceedings Held in Chambers and Sidebar without Woods' Presence

¶74 Woods claims that he was denied his right to a public trial and to due process because certain proceedings were held in chambers and at sidebar without him being present.[13] As noted above, we will review this issue as if it had been raised on direct appeal.

¶75 A defendant has a fundamental right to be present when evidence is being presented. *In re Pers. Restraint of Pirtle*, 136 Wn.2d 467, 483, 965 P.2d 593 (1998). "A defendant has the right to be present at proceedings where his or her presence has a reasonably substantial

---

[13] This opinion discusses only the two in-chambers meetings that Woods discusses in his fact section. Although he raises the sidebar issue, he does not provide any specific instances where he should have been present.

relation ' "to the fullness of his opportunity to defend against the charge." ' " *Id.* (quoting *In re Pers. Restraint of Lord*, 123 Wn.2d 296, 306, 868 P.2d 835 (1994) (quoting *United States v. Gagnon*, 470 U.S. 522, 526, 105 S. Ct. 1482, 84 L. Ed. 2d 486 (1985))). This court, however, has held that a defendant " 'does not have a right to be present during in-chambers or bench conferences between the court and counsel on legal matters.' " *Id.* at 484 (quoting *Lord*, 123 Wn.2d at 306). Furthermore, the defendant need not be present " 'when presence would be useless, or the benefit but a shadow.' " *State v. Rice*, 110 Wn.2d 577, 616, 757 P.2d 889 (1988) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 106-07, 54 S. Ct. 330, 78 L. Ed. 674 (1934)). Therefore, the question to be answered here is whether the matters addressed out of Woods' presence were ones that required his presence.

¶76 The two instances in which Woods claims he should have been present related to concerns about juror misconduct. The first involved the anonymous phone call regarding alternate juror, Lynnell McFarland, and the second instance involved the two jurors who complained about the alternate juror, Randle Riddle.

¶77 We faced a similar issue in *Pirtle*. There Pirtle argued that his presence was required at the meeting regarding the alleged juror misconduct. We noted that it may have been appropriate for Pirtle to be present, but no error was shown because Pirtle was apprised of the situation and the matter was put on the record. *Pirtle*, 136 Wn.2d at 484. We, however, did not state that all defendants are entitled to attend all meetings relating to juror misconduct. Here, during the conference it was asked whether Woods' presence was necessary and Woods' attorney stated that it was not. VRP at 4336-37. Thus, even under the more lenient standard applicable to direct appeals, Woods' argument fails.

## 11. Admittance of Compelled Statement

¶78 Woods claims, finally, that during the reading of his *Miranda*[14] rights, Detective Grabenstein failed to tell him that he had a "constitutional right to stop answering questions at any time until he talked to a lawyer." Am. Pet. at 206. Because of this alleged omission, Woods argues, the statement he made to the detectives should not have been admitted into evidence.

¶79 Under *Miranda*, a suspect in custody must be warned prior to any questioning that: (1) he has the absolute right to remain silent, (2) anything that he says can be used against him, (3) he has the right to have counsel present before and during questioning, and (4) if he cannot afford counsel, one will be appointed for him. *State v. Brown*, 132 Wn.2d 529, 582, 940 P.2d 546 (1997) (quoting *Miranda*, 384 U.S. at 479). Here, Detective Grabenstein read those warnings to Woods from a "constitutional rights card." VRP at 2732. On this card, there are two questions: (1) "Do you understand these rights," and (2) "Do you want to give up these rights and answer my questions." *Id.* at 2734. After each of these questions, Woods wrote "yes." *Id.*

¶80 Although suspects must be advised of their *Miranda* rights, the United States Supreme Court and this court have stated that there is no requirement that the warnings be given in the precise language stated in *Miranda. Duckworth v. Eagan*, 492 U.S. 195, 202-03, 109 S. Ct. 2875, 106 L. Ed. 2d 166 (1989); *Brown*, 132 Wn.2d at 582. "The question is whether the warnings reasonably and effectively conveyed to a suspect his rights as required by *Miranda.*" *Id.*

¶81 Woods seems to contend that there is a fifth warning that must be added to the *Miranda* warnings—the right to stop answering at any time until he talks to a lawyer. *See* Am. Pet. at 207. For support, he relies on *Duckworth*. In *Duckworth*, the police department advised

---

[14] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

the defendant of his *Miranda* rights from a form that included the statement, " 'You also have the right to stop answering at any time until you've talked to a lawyer.' " *Duckworth*, 492 U.S. at 198 (quoting *Eagan v. Duckworth*, 843 F.2d 1554, 1555 (7th Cir. 1998)). The actual issue presented in *Duckworth* was whether the *Miranda* rights given, with the language " '[w]e have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you go to court,' " properly complied with *Miranda*. *Id.* at 198 (emphasis omitted). The United States Supreme Court held that the warnings "touched all of the bases required by *Miranda*." *Id.* at 203. Citing this language from *Duckworth*, Woods argues that a proper *Miranda* warning must include the language, "you also have the right to stop answering questions at any time until you've talked to a lawyer." This argument is flawed. Just because the Supreme Court stated that the warnings given in *Duckworth* touched all bases does not mean that *all* elements in the *Duckworth* warnings must be present for the warnings to be effective.

¶82 As stated before, there is no requirement that the *Miranda* warnings be given precisely as stated in *Miranda v. Arizona*. As long as the warnings are reasonably and effectively conveyed to the suspect, they are deemed proper. The actual *Miranda* warnings read to Woods by Detective Grabenstein were as follows:

> I am Mark Henderson and Rick Grabenstein, deputy sheriff. You have the right to remain silent. Anything you say can and will be used against you in a court of law.
>
> You have the right to talk to an attorney before answering any questions. . . . You have the right to have your attorney present during the questioning. If you cannot afford an attorney, one will be appointed for you without cost before any questioning if you so desire.

Report of Proceedings at 2733. From the above excerpt, it is clear that Woods was given proper *Miranda* warnings. Although they are not word for word from *Miranda v. Arizona*, the message they convey is clear.

## IV. CONCLUSION

¶83 After consideration of Woods' amended personal restraint petition and thorough review of the record, we conclude that Woods' claims are meritless. We, therefore, deny his amended personal restraint petition.

C. JOHNSON, MADSEN, BRIDGE, OWENS, and FAIRHURST, JJ., and IRELAND, J. Pro Tem., concur.

¶84 CHAMBERS, J. (concurring in part/dissenting in part) — I agree with the majority that "Woods has not shown that his due process and equal protection rights were violated by the denial of some of his requests for funds for investigative and expert services." Majority at 413. However, because Woods had a statutory right to counsel in this case, Woods' request for attorney fees should have been granted.

¶85 RCW 10.73.150 provides in relevant part:

Counsel *shall* be provided at state expense to an adult offender convicted of a crime . . . when the offender is indigent . . . and the offender:

. . . .

(3) Is under a sentence of death and requests counsel be appointed to file and prosecute a motion or petition for collateral attack.

(Emphasis added.) We have held that this statute does not authorize the expenditure of public funds for investigative services. *In re Pers. Restraint of Gentry*, 137 Wn.2d 378, 392, 972 P.2d 1250 (1999). However, in capital cases, requests for such services, as well as requests for discovery, may be granted if a petitioner establishes that there is a substantial reason to believe that the services will produce information that would support relief. *See* RAP 16.26, 16.27. In this case, we properly granted many of Woods' requests for services but denied payment for those where Woods failed to show that there was a substantial reason to believe that the services would support relief. Under the

rules of appellate procedure, such nonmandatory decisions were a proper exercise of our discretion.

¶86 RCW 10.73.150, however, does not afford us the same discretion. The language of RCW 10.73.150(3) is mandatory: when an indigent offender under sentence of death so requests, counsel "shall be provided . . . to file and prosecute" a personal restraint petition. This statute generally expands the right to counsel beyond constitutional requirements. *State v. Mills*, 85 Wn. App. 285, 290, 932 P.2d 192 (1997). In enacting the statute, the legislature conferred upon indigent petitioners a substantive right to counsel in collateral proceedings. *Id.* Providing publicly funded counsel for indigent petitioners is uniquely within the power of the legislature. "It is the Legislature's prerogative, as the taxing and appropriating branch of government, to determine what actions other than those which are constitutionally mandated will be publicly funded." *In re Dependency of Grove*, 127 Wn.2d 221, 236, 897 P.2d 1252 (1995).

¶87 Woods was appointed counsel to prepare and file a personal restraint petition. After his petition was filed, this court ordered a re-transcription of portions of the trial record, and Woods then filed an amended personal restraint petition. Though she was authorized by the Office of Public Defense to represent Woods in this matter, counsel was not paid for all of the work that she did on Woods' behalf. Most of the additional work was necessitated by our decision to order a re-transcription of the proceedings, which required Woods' counsel to review a new record and prepare an amended personal restraint petition. We denied Woods' motion for an order authorizing sufficient funds for counsel on May 8, 2003. To the extent that Woods' request for additional attorney fees was reasonable, that order was in error. The majority concludes that authorization of additional time to complete the amended petition is unreasonable because the previously authorized payment was "sufficient to allow completion" of the amended petition. Majority at 413-14. Clearly, however, the previously autho-

rized amount of time was not sufficient because Woods' attorney actually performed considerably more work than this court authorized. Because I have no reason to suspect that Woods' attorney did not require this additional time, I cannot say that the request was unreasonable.

¶88 Because the mandatory language of RCW 10.73.150 clearly applies to this situation, we should have granted Woods' motion for an order authorizing sufficient funds. The legislature mandates that counsel be publicly funded in situations such as these. The majority's decision to deny such funding is in error.

¶89 While I concur with the majority's analysis of the remaining issues, I respectfully dissent with regard to its decision to deny Woods' request for attorney fees.

SANDERS, J., concurs with CHAMBERS, J.

Reconsideration denied September 30, 2005.