# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 48991-1-II |
| Respondent, | |
| v. | |
| BRANDON LEE FARMER, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. — Brandon Lee Farmer appeals his conviction for first degree murder, arguing that (1) the trial court erred when it declined to give an instruction on the lesser included offenses of first and second degree manslaughter, and (2) the prosecutor committed misconduct during trial. Farmer also raises several claims in a statement of additional grounds (SAG).

We hold that (1) the trial court did not err when it declined to give an instruction on first or second degree manslaughter, and (2) the prosecutor did not commit misconduct. We also hold that Farmer's SAG claims fail. Accordingly, we affirm.

FACTS

A.    THE INCIDENT

On the night of August 26 into the morning of August 27, 2006, Dusty Titus and Farmer were driving around Tacoma and drinking in Titus's truck.[1] The two eventually drove towards downtown Tacoma.

---

[1] Titus drove a blue Chevy S-10 pickup truck.

There, they encountered Velma Tirado. Tirado got into the truck and sat in the center seat. They then drove to an alley where Tirado was shot in the head. Farmer and Titus drove away through the alley and went home.

Witnesses who were in the alley when the gunshots were fired went over and saw Tirado's body lying on the ground. One of the witnesses then went to flag down a police officer. Paramedics arrived on the scene and discovered a bullet wound behind Tirado's ear and noted she was dead.[2] Tacoma Police Detective Gene Miller was the lead investigator on the case, but no suspect was identified and the case remained unsolved.

B.      THE CALL

On October 21, 2014, Detective Miller received a call from the Humboldt County District Attorney's Office informing him that there was a potential witness in the case who had information about a suspect. The potential witness was Dusty Titus, and the suspect was Farmer. Detective Miller went to California and spoke with Titus, who told him what happened. Based on the information Titus provided, Farmer was charged with first degree murder of Tirado.

C.      EVIDENTIARY MATTERS

On motions in limine heard pretrial, the trial court ruled that there was to be no mention that Farmer stole a .357 caliber gun, that Farmer was smoking in a grocery store and was run off by security, and that Farmer mentioned he killed people all the time. The trial court ruled that Farmer's statements to Detective Miller about patronizing prostitutes were admissible, but that

---

[2] The bullet that was recovered was specifically consistent with being fired from a "Ruger, Smith & Wesson, and Taurus in a .357 Magnum caliber." 6 Verbatim Report of Proceedings (VRP) at 676.

Detective Miller's opinion was not. And the trial court excluded mention of Farmer shooting at cars and his desertion from the military.

The trial court also ruled that the two felonies for which Titus was convicted and received probation could not be named. The trial court found that the felonies were relevant to tell the story about the consequences that Titus was facing, but that the probative value of the names of those felonies was outweighed by the prejudicial effect. Also, the type of treatment that was required as a part of Titus's probation could not be named.

During trial, the State sought to introduce a gun that Titus owned that was the same make and model as the one Farmer had at the time of the shooting. Titus obtained the gun after the shooting, but the gun was not the murder weapon. The trial court admitted the gun as an illustrative exhibit. Farmer did not object.

D.    OPENING STATEMENTS

During the State's opening statement, the prosecutor gave some background facts about Titus and a brief summary of the shooting. The prosecutor stated:

> Mr. Titus got himself into a little of trouble [sic]. He got put on probation, and he got into some more trouble, and now it's 2014 and there are two things going on with Mr. Titus. Well, three things. One is he knows about an unsolved homicide in Tacoma, Washington in 2006. Another thing is he is 29 now, he is not 21 anymore, and he is in a little bit of trouble. So he talks to his lawyer and says, I have got some information. And his lawyer says, well, why don't you talk to our investigator, and he tells the investigator what happened up here. The defense investigator contacts the prosecutor, the prosecutor's investigator, and he tells that investigator what happened. That investigator calls up to Tacoma PD and gets ahold of Gene Miller, and Gene Miller knows what case he was talking about. He was talking about Velma Tirado from August 27th of 2006.
>
> . . . .

3

. . . A 45-year-old woman reduced to prostitution, shot and left dead in an alleyway. Police do what they can, but nobody comes forward, and the case goes cold. Dusty moves back to California. He grows up. He decides it is time to tell people what happened.

They tell him, "You are not getting any benefit from this, no promises." And he goes, "I know. I get it. But I need to tell somebody," and he does. And he is going to come into this courtroom, like I said, and he is going to sit right there and he is going to tell you about this guy he knew almost ten years ago, a guy named Brandon Farmer. He didn't know his last name. He knew a Brandon who got himself a .357 revolver and said he wanted to kill somebody, who picked up a prostitute, stepped out of the cab and didn't even finish the sex act, took the gun out, shot once. That didn't work, shot twice, and said, "Let's go."

Verbatim Report of Proceedings (VRP) (March 15, 2016, Opening Statements) at 18-19, 23-24.

Farmer did not object to the prosecutor's opening statement.

Once both sides presented their opening statements, Farmer then raised an issue with the prosecutor's statement about Farmer wanting to kill somebody outside of the jury's presence. Farmer argued that the statement was related to the grocery store incident that was excluded, but the trial court said that there was no request to exclude the particular statement referenced by the prosecutor and that the State would have a chance to present evidence to support the statement. The prosecutor later provided an offer of proof, and the trial court admitted the statement after considering ER 403.

E.    TRIAL TESTIMONY

1.    Testimony of Barbara Williams

Barbara Williams testified that she was homeless in 2006, was close to Tirado, and that the two stayed in the same area. The last time Williams saw Tirado, Tirado was excited because her children were going to take her back to where they were living and she wanted to spend one more

4

night with Williams and others to say goodbye. Later, Tirado said she wanted to go make some money and left. Farmer did not object to Williams's testimony.

       2.      Testimony of Dusty Titus

Titus testified that in August 2006, he owned a Lorcin .380 automatic pistol. About two weeks before the shooting, Titus and Farmer went to Farmer's friend's house and Farmer got some bullets for Titus, along with a Ruger Black Hawk .357 Magnum revolver for himself.[3]

Titus also testified that on August 27, 2006, he and Farmer drove around Tacoma, drinking in Titus's truck. Titus was driving, and he drove them towards downtown Tacoma where they picked up Tirado. They then drove to an alley, and Tirado performed oral sex on Farmer. Farmer later asked Tirado if she would like to go outside, and Farmer and Tirado got out of the truck. Farmer had his back to the open door facing the bed of the truck, and Tirado was on her knees performing oral sex on Farmer. Tirado eventually stopped and went to stand up. Titus then saw, in his peripheral vision, Farmer reach back into the waistband of his windbreaker pants, grab the .357 revolver, put it to Tirado's head, and pull the trigger. Titus was surprised that Farmer could hold a .357 in the back of his windbreaker pants without "showing signs that he had a gun in the back of his pants, or that [the gun] didn't just fall out into his pant leg." 5 VRP at 557-58. However, the pants would not necessarily be unable to hold the gun due to the loose waistband.

Titus saw a muzzle flash and Tirado push the barrel of the gun away with her left hand. Farmer then pulled the hammer of the gun back again, put it back to Tirado's head, and Tirado went rigid and fell back. Farmer then got back in the truck and the two drove away through the

---

[3] After the shooting, Titus bought several guns, one of which was a gun of the exact same style as the one used to kill Tirado.

alley and went home. Titus testified that Farmer said he wanted to kill somebody on a previous night. But Farmer said it in an almost joking manner, so Titus did not take him seriously.

After the incident, Titus got in some trouble with the law and was placed on home detention with an ankle bracelet. Titus eventually cut off the ankle bracelet and moved to California. There, Titus was convicted of two felonies and was placed on probation. Titus was later charged with 10 new felonies and faced going back into custody for the probation violations.

At that point, Titus talked to his attorney and came forward to police about Tirado's murder on August 27, 2006. Titus wanted to see if he could get better treatment for the potential time in custody and it was a heavy burden on his shoulders. Titus's attorney worked at trying to get him a deal on some of the charges. Titus eventually got all his probation violations dismissed, except for one that was awaiting sentencing, and if he stayed in compliance with his probation he would not be facing anymore jail time. Titus never entered into a formal plea or immunity agreement in Washington or California. Titus "knew that [he] would be taking a chance on being prosecuted on the murder itself, or being an accomplice." 5 VRP at 548. Titus was not promised anything for cooperating in this case, but he also was not prosecuted in the case. At the time he came forward, Titus was facing a recommended eight years in prison for his probation violations, but did not suffer any probation violation sanctions from the time he came forward to when he testified.[4] Titus testified that his testimony and what he told law enforcement was the truth. Farmer did not object.

---

[4] Titus's probation violation petition was filed in February 2014, but Titus had yet to be adjudicated at the time of trial.

6

3.      Testimony of Brandon Farmer

Farmer testified that Titus shot Tirado. On the night of the incident, Farmer and Titus went to two bars. The two drank alcohol and smoked some crack. Farmer then drove Titus to a third bar in downtown Tacoma, but could not get in, so they turned around and pulled into a parking lot. In the parking lot, the two again smoked some crack and ran into Tirado.

Farmer asked Tirado if she was working, and she said she was. Titus then got out of the truck to let Tirado in. Tirado got into the truck, and the three smoked crack. They then drove up the hill and parked in an alley. While parked, they again smoked more crack, and Tirado performed oral sex on Farmer. Tirado then stopped and grabbed the crack pipe. Titus told Tirado that it was his turn, and Tirado asked Titus what he had for her. Titus told Tirado that smoking with them was all she was getting. Titus then grabbed the gun that Farmer had given him, which was a .357 revolver, opened the passenger door, and told Tirado to get out. Tirado started to get out, but she reached back into the truck for her purse. At that point, Titus grabbed Tirado and pulled her out of the truck. Titus stumbled back and the gun went off.[5] There were two shots. Farmer asked Titus what he was doing and why he would shoot a gun in the middle of the street when they had drugs and had been drinking. Titus responded that "he didn't mean to. She tried to take [the gun]. She tried to grab it from him." 7 VRP at 773. Farmer then drove home.

---

[5] Detective Miller testified that Farmer told him that "when Dusty pulled the gun out [he] thought [Titus] was going to shoot her so [he] ran over and pushed Dusty, and that's when the gun went off." 7 VRP at 792. Farmer denied making such a statement.

7

Farmer also testified that he sold the .357 revolver to Titus. But Farmer later testified that Titus did not want to buy the gun. Farmer further testified that he did not own any guns at the time of the incident and that the gun belonged to Titus.

During Farmer's testimony, the prosecutor asked Farmer whether he patronized prostitutes, and Farmer responded that he did. The prosecutor also asked Farmer whether he remembered telling Detective Miller that he never picked up prostitutes, and Farmer admitted he did and that the statement was not true. Farmer later raised an issue with this questioning and requested a mistrial based on the introduction of testimony about Farmer patronizing prostitutes. The trial court denied Farmer's motion for a mistrial.

4.      Testimony of Gregory Thompson, Renee Scott, and Rick Kimes

Gregory Thompson and Renee Scott testified that they were in a van in the alley. A vehicle pulled into the alley. Then they heard gunshots. There were either two shots closely set or one shot with an echo. After the shots were fired, the vehicle took off past them. The vehicle sounded like a smaller car or pickup truck. Thompson and Scott went down the alley and saw a body lying on the ground. Scott then flagged down a police officer.

Rick Kimes, who lived in a house along the alley, also testified that he heard two gunshots on August 27, 2006, looked outside, saw the taillights of a vehicle going down the alley that sounded like a low-rider pickup truck, and then saw a body. There was not much of a pause between the gunshots.

5.      Testimony of Robert Wells

Robert Wells, a paramedic for the Tacoma Fire Department, testified. Wells was dispatched on August 27, 2006 to a victim with a gunshot wound. Wells arrived on the scene in

8

the alley and checked for breathing and a pulse. He discovered a bullet wound behind the victim's ear with blood and brain matter coming out, and noted she was dead. Farmer did not object to Wells's testimony.

6.     Testimony of Detective Miller

Detective Miller testified that he was the lead investigator in this case. He arrived at the scene on the night of the incident and saw a body, which was later identified as Tirado. Detective Miller noted an injury to Tirado's left ring finger; an injury to her right palm, which had some gunpowder particles; and a gunshot wound to her right earlobe, which also had some gunpowder particles. The bullet recovered from the autopsy identified the firearm involved as a revolver; specifically, a "Ruger and Smith & Wesson and looking at .357s or .38s." 4 VRP at 404. After further investigation, no suspect was identified and the case went cold.

On October 21, 2014, Miller received a call from the Humboldt County District Attorney's Office informing him that there was a potential witness who had information about a possible suspect for Tirado's killing. The potential witness was Titus and the possible suspect was Farmer. Detective Miller went down to California and spoke with Titus, who told him what happened. To Detective Miller's knowledge, Titus never received immunity and there was no formal plea agreement at the time of trial. Detective Miller also was not aware of any e-mail between the Humboldt County prosecutor and Titus's lawyer that said the prosecutor "would take prison off the table" if Titus gave them information on a homicide. Detective Miller stated that Titus was never charged with any offenses related to the incident on August 27, 2006. Farmer did not object to Detective Miller's testimony.

After Detective Miller's testimony, the trial court noted:

I'm somewhat disturbed that there is this, I don't know how to say it, perhaps the impression that Dusty Titus has not gotten a deal here. I think it's rather disingenuous to stand up in front of this jury to say he hasn't received any kind of benefit.

The distinction between an immunity agreement and a benefit really is not something that this jury is capable of understanding. You know, immunity has a distinct legal definition to it. And I think that it's quite clear from the evidence here that Dusty Titus has received a benefit. I say this only to the extent that we are going to get to closing arguments next week, and I, again, I'm not certain it would be proper to articulate to this jury that somehow he hasn't received some kind of benefit. And so I want to make that clear for everybody here.

. . . .

. . . What I'm suggesting to you is that if — if the argument is being made to this jury that, you know, he is not getting any deal here, he is not getting any benefit, that's really not representing what the evidence is clearly to this jury. And so I don't know that that is somewhere the State wants to go.

6 VRP at 715-16.

7.      Testimony of Dr. John Howard

Dr. John Howard, the Pierce County chief medical examiner in 2006, testified that he performed Tirado's autopsy. Dr. Howard noted gunpowder particles[6] on Tirado's left hand and a gunshot wound to her left ring finger. Dr. Howard stated that the "bullet had passed through the nail going from the back of the hand through the [left] palm area tearing it" and that in "this case the gun was close enough that in addition to the bullet striking the finger, the gun powder [sic] particles also could strike the skin leaving marks." 4 VRP at 441-42.

Dr. Howard also stated that Tirado had another gunshot wound in her right ear and that there was gunpowder particles on her skin and in her hair. That bullet went through Tirado's ear,

---

[6] Marks left by gunpowder particles are also referred to as stippling.

through her neck, through her shoulder and arm, and was found in her clothing. The angle of the bullet wound was consistent with Tirado kneeling when the shot was fired. The angle of the bullet and her injuries also were consistent with Tirado being shot as she was in the process of standing up. The wound through the neck caused "profuse bleeding," not "instantaneous death," but was the cause of death. 4 VRP at 456. Based on the pattern of the gunpowder particles, Dr. Howard estimated that the shooter was less than a foot away when he fired the shot and that all of the wounds could have been caused by a single bullet. Ultimately, Dr. Howard concluded that the manner of death was homicide.

8.      Testimony of Dr. Clifford Nelson

Dr. Clifford Nelson, a forensic pathologist, testified on behalf of the defense. He was asked to look at the injuries and trajectory of the bullet in this case. Dr. Nelson testified that Tirado could not have been standing with her head up when she was shot. When Tirado was shot, she had her left hand up to block it. The path of the bullet wound did not fit with a person standing with a door open on a truck, standing face-to-face with a person shooting them. Rather, the path of the bullet was consistent with a person covering up and turning away from the shooter. And it was more likely that there were two shots. Tirado also had a cut and gunpowder particles on her right hand that was consistent with her hand touching or being within millimeters of the gun when it was shot.

9.      Testimony of Duane Smith

Duane Smith was Titus's probation officer in California. Smith testified that Titus had a few probation violations, including not complying with treatment for two cases, and that he had asked for Titus's probation to be revoked. There was an extended period of time where no action was taken on the probation violation report he submitted. Smith inquired about the inaction, and

his boss told him that Titus was cooperating in a case in Washington. Titus was set to be adjudicated on his probation violations on April 4, 2016. Smith believed that the two-year gap between the submission of his probation violation report and the adjudication of the probation violations was unusual.

F.      CLOSING ARGUMENTS

        1.      State's Closing Argument

        During the State's closing argument, the prosecutor stated:

> While there is certainly reason to believe that Dusty received a benefit for his cooperation, it was not under an immunity agreement with the State of Washington. Benefit or not, in coming forward Dusty placed himself at the scene of the crime. He admitted to driving the shooter away from the scene after hearing two shots, after seeing the muzzle flash, after seeing [Tirado] push the gun away, after watching the defendant cock the hammer again while [Tirado] covered up her head with her left hand, after watching [Tirado] fall to the ground.
>
> . . . .
>
> Why would Dusty place himself at the scene and admit to owning a similar type weapon? He had been hoping to avoid prison time in California. He's not guaranteed a walk here in Washington. Because he knew he was telling the truth. . . .
>
> If Dusty wanted to help himself out, he could have done that without placing himself at the scene. He could have gotten on the stand and told you that the defendant told him he had shot her. He could have worn a wire discussing the case and the incident with the defendant.

8 VRP at 864-66.

        The prosecutor then argued that Titus's testimony was consistent throughout and consistent with the testimony of the other witnesses. In doing so, the prosecutor pointed out the fact that Titus said there were two shots, like the other witnesses testified to, and that Titus said he drove a pickup truck that night, which was also like what witnesses had heard.

12

The prosecutor also provided argument on Titus's testimony about Farmer's pants and their ability to hold the gun while receiving oral sex. She argued that Farmer could have pulled his waistband down just enough, which would have made the waistband tighter. The prosecutor provided an example by saying, "If any of you gentlemen in this jury have ever been on a long road trip or a hike and you have to answer the call of nature and there is no facility nearby, you know exactly what I'm talking about." 8 VRP at 868.

The prosecutor then argued that Farmer's testimony was inconsistent and that Farmer did not state there were two shots.[7] Farmer did not object to this statement.

On rebuttal, the prosecutor stated:

> [Defense counsel] suggested that we are trying to argue that Dusty Titus received no benefit. We are not saying that. In fact, he told you, and I told you in opening, that he came forward for two reasons: One was this was weighing on his conscience, and the other was he was in trouble and he was hoping he would get some consideration. You heard he was told repeatedly there is no promises or deals upfront, but we will see what you have to say.

> Mr. Smith did not testify that he wasn't given sanctions. He said just the opposite. He had been repeatedly sanctioned and incarcerated for his probation violations, and he was treated just like everybody else. And that two-year gap, guess what? He has two years of probation now because of that. He would be done otherwise.

8 VRP at 896.

### 2. Farmer's Closing Argument

During the defense's closing argument, Farmer argued that Titus did receive a deal.

> There are two things we believe the evidence has shown in this case and show powerfully. First, despite the suggestion that Dusty Titus didn't have an immunity agreement, a formal, written immunity agreement, and to suggest he

---

[7] The prosecutor's argument here was inconsistent with Farmer's testimony that there were two shots.

didn't have a deal going on, not only is it not based on the facts, all the facts you heard was that he got quite a bit of a deal and a benefit from saying he would testify about a murder. So to suggest that he didn't have a deal is just a misrepresentation also.

. . . .

So it's then in October of 2014 that detectives receive a call from an investigator, . . . from Humboldt County, California, and the investigator there reports that he just had a conversation with Dusty Titus who was looking for a deal to get out of at least eight years of prison on two felonies he was on probation for.

Mr. Titus said he would cooperate if, and I asked him this on cross examination, yeah, I mean, as long as I wasn't to go up there and get arrested and have to do extradition, and you know. So he is looking for a deal. They are doing the nod-nod, wink-wink. We can't promise you any deals. Wink-wink. So just give us what you know and we will see what we can work out for you.

8 VRP at 880, 882. Farmer continued to emphasize this point throughout the rest of his closing argument.

G.    JURY INSTRUCTIONS AND VERDICT

In discussions on jury instructions, Farmer objected to the trial court not giving the defense's proposed instructions on the lesser included offenses of first or second degree manslaughter. The trial court declined to give the instructions on first or second degree manslaughter because the evidence failed to meet the factual prong of the *Workman* test.[8] The trial court found that "there was not sufficient evidence to demonstrate that the acts of the defendant here were neither reckless, nor criminally negligent," and that Farmer testified that he was not the shooter in this case. 8 VRP at 856.

---

[8] *State v. Workman*, 90 Wn.2d 443, 447-48, 584 P.2d 382 (1978).

The trial court then instructed the jury, among other things, that they were the sole judges of credibility of each witness and may consider "any personal interest that the witness might have in the outcome or the issues [and] any bias or prejudice that the witness may have shown." Clerk's Papers at 90. The trial court also instructed the jury that the "lawyers' statements [were] not evidence," the "evidence [was] the testimony and the exhibits," and that they had to "disregard any remark, statement, or argument that [was] not supported by the evidence or the law in [the court's] instructions." CP at 90.

The jury found Farmer guilty of first degree murder while armed with a firearm. Farmer moved for a new trial based on the prosecutor's insinuation that Titus was not insulated from prosecution and the prosecutor's inquiry into Farmer's prior bad acts. The trial court denied Farmer's motion. Farmer appeals.

## ANALYSIS

### A.    LESSER INCLUDED OFFENSE INSTRUCTIONS

Farmer argues that the trial court erred when it declined to give lesser included offense instructions for first degree or second degree manslaughter. We disagree.

#### 1.    Legal Principles

The right to a lesser included offense instruction is statutory. *State v. Condon*, 182 Wn.2d 307, 316, 343 P.3d 357 (2015); *see* RCW 10.61.006. A defendant is entitled to a lesser included offense instruction if the two prongs of the *Workman*[9] test are met. *Condon*, 182 Wn.2d at 316. First, under the legal prong, each element of the lesser included offense must be a necessary

---

[9] *Workman*, 90 Wn.2d at 447-48.

element of the charged offense. *Workman*, 90 Wn.2d at 447-48. Second, under the factual prong, the evidence presented must support "an inference that *only* the lesser offense was committed, to the exclusion of the greater, charged offense." *Condon*, 182 Wn.2d at 316 (emphasis in original).

When analyzing the factual prong, we view the supporting evidence in the light most favorable to the party who requested the instruction. *Id.* at 321. A trial court "must consider all of the evidence that is presented at trial when it is deciding whether or not an instruction should be given." *State v. Fernandez–Medina*, 141 Wn.2d 448, 456, 6 P.3d 1150 (2000). A lesser degree instruction should be given "[i]f the evidence would permit a jury to rationally find a defendant guilty of the lesser offense and acquit him of the greater" offense. *State v. Henderson*, 180 Wn. App. 138, 144, 321 P.3d 298 (2014), *aff'd*, 182 Wn.2d 734, 344 P.3d 1207 (2015). The evidence must "affirmatively establish the defendant's theory of the case—it is not enough that the jury might disbelieve the evidence pointing to guilt." *Fernandez–Medina*, 141 Wn.2d at 456. If the trial court fails to give a lesser included instruction when the defendant is entitled to one, it commits reversible error. *Condon*, 182 Wn.2d at 326.

Where only the factual prong is in dispute, we review the trial court's determination for an abuse of discretion.[10] *State v. LaPlant*, 157 Wn. App. 685, 687, 239 P.3d 366 (2010). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or reasons. *State v. Neal*, 144 Wn.2d 600, 609, 30 P.3d 1255 (2001).

---

[10] Because Farmer does not raise issue with the trial court's analysis of the legal prong under the *Workman* test, we focus our review on whether the factual prong of the test was satisfied. *See Fernandez–Medina*, 141 Wn.2d at 455.

  2.  First and Second Degree Manslaughter

  Under RCW 9A.32.060(1)(a),[11] a person is guilty of first degree manslaughter when he recklessly causes the death of another. A person "acts recklessly when he or she knows of and disregards a substantial risk that a wrongful act may occur and his or her disregard of such substantial risk is a gross deviation from conduct that a reasonable person would exercise in the same situation." RCW 9A.08.010(1)(c).

  Under RCW 9A.32.070(1),[12] a person is guilty of second degree manslaughter when he causes the death of another with criminal negligence. A person "acts with criminal negligence when he or she fails to be aware of a substantial risk that a wrongful act may occur and his or her failure to be aware of such substantial risk constitutes a gross deviation from the standard of care that a reasonable person would exercise in the same situation." RCW 9A.08.010(1)(d).

  Under RCW 9A.08.020(1), a "person is guilty of a crime if it is committed by the conduct of another person for which he or she is legally accountable." A person is legally accountable for the conduct of another person when the person is an accomplice of the other person in the commission of the crime. RCW 9A.08.020(2)(c). A person is an accomplice when he aids or agrees to aid such other person in planning or committing the crime with knowledge that it will promote or facilitate commission of the crime. RCW 9A.08.020(3)(a)(ii). A person acts

---

[11] The legislature amended RCW 9A.32.060 in 1997 and 2011. LAWS OF 1997, ch. 365 § 5; LAWS OF 2011, ch. 336, § 357. The amendments did not alter the statute in any way relevant to this case; accordingly, we cite the current version of the statute.

[12] The legislature amended RCW 9A.32.070 in 1997 and 2011. LAWS OF 1997, ch. 365 § 6; LAWS OF 2011, ch. 336, § 358. The amendments did not alter the statute in any way relevant to this case; accordingly, we cite the current version of the statute.

knowingly when "he or she is aware of a fact, facts, or circumstances or result described by a statute defining an offense" or "has information which would lead a reasonable person in the same situation to believe that facts exist which facts are described by a statute defining an offense." RCW 9A.08.010(1)(b). And a person acts "intentionally when he or she acts with the objective or purpose to accomplish a result which constitutes a crime." RCW 9A.08.010(1)(a).

Here, Titus testified that Farmer reached back into his waistband, grabbed the .357 revolver, put it to Tirado's head, and pulled the trigger. Titus saw the muzzle flash, Tirado push the barrel of the gun away, Farmer pull the hammer of the gun back again, put it back to Tirado's head again, and then Tirado fall back. This testimony did not support an inference that Farmer acted recklessly or with criminal negligence, nor did it establish that Farmer only committed first degree or second degree manslaughter. Instead, this testimony supported an inference that Farmer acted intentionally or knowingly.

Farmer argues that the trial court failed to consider the evidence that showed a possible struggle, and that the experts testified it was possible there was only one shot. But the evidence did not support an inference nor affirmatively establish that there was a possible struggle that resulted in a reckless or criminally negligent shooting. Even though Titus testified that Tirado pushed the gun away, that evidence still showed that Farmer put the gun to Tirado's head and pulled the trigger. And although Dr. Nelson testified that Tirado had an injury on her right hand that was consistent with touching or being close to the gun when it was shot and Thompson testified that there may have only been one shot, it is not reasonable to infer from that evidence that there was a struggle resulting in a reckless or criminally negligent shooting. There was no evidence presented that Farmer unintentionally shot Tirado and the evidence that was presented

did not affirmatively establish nor allow the jury to "rationally find [the] defendant guilty of the lesser offense and acquit him of the greater" offense. *Henderson*, 180 Wn. App. at 144.[13]

Farmer testified that Titus shot Tirado, and afterwards, Farmer asked Titus what he was doing and why he would shoot a gun in the middle of the street when they had drugs and had been drinking. Titus's response was that "he didn't mean to." 7 VRP at 773. Detective Miller testified that Farmer told him he pushed Titus and the gun went off, even though Farmer denied making that statement. This testimony also did not support an inference that Farmer only committed first or second degree manslaughter, as an accomplice. Instead, the testimony showed that Farmer did not know that Titus was going to shoot Tirado, and in fact, supported an inference that Farmer did not commit any wrongful act because this testimony would have established an inference that Farmer tried to prevent Titus from shooting Tirado.

Farmer also argues that the trial court took an overly limited view of evidence that showed Farmer pushed Titus causing the gun to go off accidentally. From this evidence, he argues that the jury could have believed that the shooting of Tirado was the result of recklessness or criminal negligence, warranting a first or second degree manslaughter instruction. However, in such a scenario, Titus would be the one who shot Tirado and Farmer could only be liable as an accomplice. But the evidence does not support accomplice liability, as discussed above. Thus, the evidence fails to support an inference that Farmer only committed first or second degree manslaughter.

---

[13] And despite the fact that evidence was presented to show that Farmer had been drinking alcohol and smoking crack on the night of the incident, there was no evidence that showed Farmer drank or smoked to the point of potentially impairing his ability to form the requisite intent to kill. *See e.g., State v. Berlin*, 133 Wn.2d 541, 552, 947 P.2d 700 (1997).

Farmer lastly argues that there is no requirement that the defendant's defense be consistent with the rest of the evidence. However, the evidence is not only inconsistent with Farmer's defense, but it also is insufficient for an inference of only a reckless or criminally negligent killing constituting first or second degree manslaughter. Therefore, we hold that the trial court did not err by not providing a lesser included offense instruction.

B.    PROSECUTORIAL MISCONDUCT

Farmer argues that the prosecutor committed misconduct by making misleading statements in his opening statement and closing argument, and misleading the jury in his examination of witnesses. We disagree.

1.    Legal Principles

To prevail on a claim of prosecutorial misconduct, a defendant must establish that the prosecutor's conduct was improper and prejudicial. *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). We first determine whether the prosecutor's conduct was improper. *Id.* at 759. Any allegedly improper statements are reviewed in the context of the entire case, the prosecutor's entire argument, the issues in the case, the evidence discussed in the argument, and the jury instructions. *State v. Thorgerson*, 172 Wn.2d 438, 443, 258 P.3d 43 (2011); *State v. Dhaliwal*, 150 Wn.2d 559, 578, 79 P.3d 432 (2003). It is misconduct to make arguments unsupported by the admitted evidence. *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 58, 296 P.3d 872 (2013). And a prosecutor may not mislead the jury by misstating the evidence. *State v. Guizzotti*, 60 Wn. App. 289, 296, 803 P.2d 808, *review denied,* 116 Wn.2d 1026 (1991). But during opening statements, any party may refer to admissible evidence expected to be presented at trial. *City of Puyallup v. Spenser*, 192 Wn. App. 728, 731, 366 P.3d 954 (2016). "The only requirement is that counsel have a good

faith belief that the evidence will be produced at trial." *Id*. And in the context of closing arguments, a prosecutor has wide latitude to make arguments to the jury and may draw reasonable inferences from the evidence. *State v. Fisher*, 165 Wn.2d 727, 747, 202 P.3d 937 (2009). If the prosecutor's conduct was improper, the question turns to whether the misconduct resulted in prejudice. *Emery*, 174 Wn.2d at 760.

Prejudice is established by showing a substantial likelihood that such misconduct affected the verdict. *Id*. Where a defendant does not object at trial, he is deemed to have waived any error unless the prosecutor's misconduct was so flagrant and ill-intentioned that an instruction could not have cured any resulting prejudice. *Id.* at 760-61. Under this heightened standard, the defendant must show that "(1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" *Id.* at 761 (quoting *Thorgerson*, 172 Wn.2d at 455). In making that determination, we "focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured." *Id.* at 762. In determining prejudice, we look at the comments "in the context of the total argument, the issues in the case, the evidence, and the instructions given to the jury." *State v. Warren*, 165 Wn.2d 17, 28, 195 P.3d 940 (2008), *cert. denied*, 556 U.S. 1192 (2009). The jury is presumed to follow the trial court's instructions. *State v. Anderson*, 153 Wn. App. 417, 428, 220 P.3d 1273 (2009), *review denied*, 170 Wn.2d 1002 (2010).

2.      Opening Statement

During the State's opening statement, the prosecutor stated that Titus came forward about the incident for three reasons. Titus had knowledge about an unsolved murder and needed to tell

someone, he had gotten himself in trouble, and had grown up. Specifically, the prosecutor said that the authorities told Titus, "'You are not getting any benefit from this, no promises.' And he goes, 'I know. I get it. But I need to tell somebody.'" VRP (Mar. 15, 2016, Opening Statements) at 24.

Farmer argues that these statements were blatant misrepresentations and that Titus was clearly not motivated by the need to tell someone about the incident. But these statements were supported by the evidence presented at trial. Titus was 29 years old and eight years had passed after the incident when Titus decided to talk to the police about Tirado's murder. Titus testified that he had been charged with 10 new felonies and faced going back into custody for probation violations. Titus also testified that he was not promised anything for cooperating and never entered into a formal plea agreement. And Titus further testified that he came forward in part because it was a heavy burden on his shoulders. This testimony supported the prosecutor's statements. As a result, the prosecutor did not misrepresent the facts nor mislead the jury during opening statements.

Furthermore, Farmer fails to argue that the prosecutor lacked a good faith belief that the evidence he referred to in his opening statement would be presented. In fact, the trial court's admission of the evidence supporting the prosecutor's statement demonstrates his good faith. *See Spenser*, 192 Wn. App. at 731.

And Farmer also failed to object to the prosecutor's opening statement and fails to show that there was misconduct so flagrant and ill-intentioned that an instruction could not have cured any resulting prejudice. As a result, Farmer also waived any error. *Emery*, 174 Wn.2d at 760-61. Therefore, we hold that the prosecutor did not commit misconduct during opening statements.

3.      Direct and Redirect of Titus

On direct examination of Titus, the prosecutor elicited testimony that Titus was facing a return to custody for violating his probation when he came forward to law enforcement about Tirado's murder. Titus testified that he came forward in part because he wanted to seek better treatment for his probation violations, that all of his probation violations had been eventually dismissed, and that if he stayed in compliance with his probation he would not be facing any more jail time. Titus also testified that he did not enter into any formal plea agreement in Washington or California. And on redirect examination, the prosecutor elicited testimony from Titus that, when he came forward, he did so on his own and no promises were made that he would not get charged or was going to get help in any way.

Farmer argues that this questioning was misleading because "it suggested there were not ongoing negotiations occurring" and "suggested Titus did not expect anything for his cooperation." Br. of Appellant at 30-31. However, considering the context of the case, the issues in the case, and the evidence presented, the prosecutor's questioning was not misleading. In fact, the prosecutor never suggested that Titus came forward because he did not expect anything for his cooperation. Instead, the prosecutor did the opposite and elicited testimony from Titus that he came forward because he was facing going back into custody and wanted to seek better treatment. And there was testimony that Titus's attorney was trying to get him a deal. While the prosecutor did elicit testimony from Titus that there was no formal agreement in place and no promises were made, the prosecutor did not suggest that no negotiations were taking place or that Titus did not receive a benefit. Also, the prosecutor elicited testimony from Titus that he was facing additional time in custody for violating his probation, all of his violations were eventually dismissed, and he

would not be facing any more jail time if he stayed in compliance with his probation. This testimony actually suggested that Titus did receive a benefit for coming forward. As a result, the prosecutor did not mislead the jury.

Moreover, Farmer failed to object to the prosecutor's questioning and fails to show that there was misconduct so flagrant and ill-intentioned that an instruction could not have cured any resulting prejudice. As a result, Farmer also has waived any alleged error. *Id.* Therefore, we hold that the prosecutor did not commit misconduct when he questioned Titus about the benefits Titus received for coming forward with information about Tirado's murder.

4.      Direct of Detective Miller

Farmer argues that the prosecutor's questioning of Detective Miller was misleading because it suggested that Titus could still face potential charges. We disagree.

When questioning Detective Miller, the prosecutor elicited testimony from him that, to his knowledge, Titus never received immunity in this case. This questioning and testimony about an immunity agreement was not misleading as the prosecutor only inquired about the existence of a formal agreement, which the evidence showed did not exist at the time. Titus had testified that there were no promises made and that he did not enter into a formal plea agreement. Titus also testified that he was not promised anything for cooperating in this case, but was also not prosecuted in the case nor suffered any probation revocation sanctions. And Detective Miller only testified to his knowledge.

While Farmer correctly notes that the trial court provided a warning to the parties about inquiring into the benefits that Titus may or may not have received in closing arguments, the prosecutor's questions did not misrepresent any facts because there was no evidence that a formal

agreement was in place. The evidence showed that Titus received some sort of benefit.[14] Farmer's argument based on the trial court's warning is also not well taken as the trial court later clarified that it was meant to prohibit the State from arguing that Titus did not receive *any* benefit.

Additionally, Farmer failed to object to the prosecutor's questioning on this basis and fails to show that there was misconduct so flagrant and ill-intentioned that an instruction could not have cured any resulting prejudice. As a result, Farmer also waived any error. *Id.* Therefore, we hold that the prosecutor did not commit misconduct when he questioned Detective Miller.

5.      State's Closing Argument[15]

During the State's closing argument, the prosecutor argued that "[w]hile there is certainly reason to believe that Dusty received a benefit for his cooperation, it was not under an immunity agreement with the State of Washington." 8 VRP at 864-65. The prosecutor continued by arguing:

> Why would Dusty place himself at the scene and admit to owning a similar type weapon? He had been hoping to avoid prison time in California. He's not guaranteed a walk here in Washington. Because he knew he was telling the truth.

8 VRP at 865.

---

[14] Farmer suggests that the prosecutor's questioning implied that Titus was testifying at great risk to himself. However, the prosecutor never made this argument and elicited testimony that suggested Titus received some benefit.

[15] Farmer did not object during closing and rebuttal arguments, but he did make a motion for a new trial after the jury returned its verdict. Farmer's motion was effectively a motion for a mistrial based on the prosecutor's arguments regarding the lack of an immunity agreement and the prosecutor's mention of Farmer's prior bad acts. Therefore, Farmer preserved his claims related to the State's closing and rebuttal arguments.

Farmer argues that the prosecutor committed misconduct by suggesting that Titus could still face charges for Tirado's murder. However, in reviewing the evidence at trial, the prosecutor's arguments were supported by and did not misstate the admitted evidence.

Detective Miller testified that to his knowledge, Titus never received immunity and there was no agreement at the time of trial. Titus testified that when he came forward, he did so on his own and "knew that [he] would be taking a chance on being prosecuted on the murder itself, or being an accomplice." 5 VRP at 548. Titus also testified that no promises were made that he would not get charged or was going to get help in any way. This evidence supported the prosecutor's argument. The prosecutor had wide latitude to make arguments to the jury and to draw reasonable inferences from the evidence. *Fisher*, 165 Wn.2d at 747. Therefore, we hold that the prosecutor did not commit misconduct during the State's closing argument.

6.     State's Rebuttal Arguments

Farmer argues that the State's rebuttal argument suggested that Titus did not receive favorable treatment in California and that the State's rebuttal argument was patently false. In support, Farmer points to (1) Smith's testimony that the two-year gap between the submission of his probation violation report and the adjudication of the violation was unusual, and (2) the prosecutor's representation that Titus was not expected to complete the treatment required as a part of his probation and would not be in violation for not completing it.

The prosecutor's statements are considered in the context of the entire case, the prosecutor's entire argument, the issues in the case, the evidence discussed in the argument, and the jury instructions. *Thorgerson*, 172 Wn.2d at 443; *Dhaliwal*, 150 Wn.2d at 578. And the

prosecutor is allowed to make arguments to the jury and may draw reasonable inferences from the evidence. *Fisher*, 165 Wn.2d at 747.

Here, the prosecutor argued on rebuttal that Titus was treated like everybody else. Considering the entire context of the case and the prosecutor's argument, there was evidence presented during trial that supported the prosecutor's statement.

Titus testified that no promises were made for his cooperation in this case and that he never entered into a formal plea agreement in Washington or California. Detective Miller also testified that Titus did not receive immunity and was not punished less than other similarly situated probationers for the same violations. This evidence allowed the prosecutor to draw the inference that Titus was treated like everybody else. While other evidence also suggested that Titus may have received a benefit or special treatment for cooperating, the prosecutor stated that he was not arguing that Titus did not receive a benefit. As a result, the prosecutor's statement was not patently false. Therefore, we hold that the prosecutor did not commit misconduct during the State's rebuttal argument.

C.    SAG

1.    Excluding Named Felonies and Treatment

Farmer argues that the trial court erred when it excluded any mention of the names of Titus's new felony convictions and the type of treatment that Titus was required to complete. Under ER 404(b), "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Under ER 403, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger

of unfair prejudice." The trial court's evaluation of evidence under ER 404 and ER 403 is reviewed for a manifest abuse of discretion. *State v. Vreen*, 143 Wn.2d 923, 932, 26 P.3d 236 (2001).

Here, the trial court excluded the names of Titus's convictions and the type of treatment that he was required to complete based on its weighing of the probative value and prejudicial effect of the evidence under ER 403. But Farmer fails to show how the trial court abused its discretion and otherwise fails to provide any legal argument or support for his assertion that the exclusion of the evidence misled the jury. *State v. Cox*, 109 Wn. App. 937, 943, 38 P.3d 371 (2002) (holding that where an appellant fails to provide argument or authority, we are "not required to construct an argument on behalf of appellants"). Therefore, we hold that this claim fails.

2.      Admitting Illustrative Exhibit

Farmer argues that the trial court erred when it admitted the gun that Titus had previously owned as an illustrative exhibit. "'The use of demonstrative or illustrative evidence is to be favored and the trial court is given wide latitude in determining whether or not to admit demonstrative evidence.'" *In re Pers. Restraint of Woods*, 154 Wn.2d 400, 426, 114 P.3d 607 (2005) (quoting *State v. Lord*, 117 Wn.2d 829, 855, 822 P.2d 177 (1991), *cert. denied*, 506 U.S. 856 (1992)). To be admissible for illustrative purposes, the evidence must be substantially similar to "'the real thing.'" *State v. Powell*, 62 Wn. App. 914, 920, 816 P.2d 86 (1991) (quoting *State v. Barr*, 9 Wn. App. 891, 895, 515 P.2d 840 (1973)), *review denied*, 118 Wn.2d 1013 (1992). We review a trial court's admission of evidence for an abuse of discretion. *State v. Perez-Valdez*, 172 Wn.2d 808, 814, 265 P.3d 853 (2011).

Here, the trial court admitted as an illustrative exhibit a gun that Titus had owned that was the same make and model as the one Farmer had at the time of the incident. Farmer did not object.

As a result, he waived any claim of error on appeal regarding the admission of the gun. RAP 2.5(a).

### 3. Ineffective Assistance of Counsel

Farmer argues that defense counsel was ineffective for failing to object to Williams's testimony because it was inadmissible character evidence used to "cause sympathy" for Tirado and to "anger the jury." SAG at 3. To establish ineffective assistance of counsel, Farmer must show both deficient performance and resulting prejudice. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). If Farmer fails to establish either prong of the test, we need not inquire further. *State v. Foster*, 140 Wn. App. 266, 273, 166 P.3d 726, *review denied*, 162 Wn.2d 1007 (2007).

Here, Farmer fails to establish either prong of the test. Therefore, this claim fails.[16]

### 4. Prosecutorial Misconduct

#### a. Misrepresenting Titus's testimony about Farmer's previous statement

Farmer argues that the prosecutor misrepresented Titus's testimony about Farmer's statement that he wanted to kill someone. However, Farmer does not show how the prosecutor's statement was a misrepresentation. Therefore, this claim fails.

#### b. Referencing Farmer's previous statement

Farmer argues that the prosecutor committed misconduct during the State's opening statement by insinuating that he said he wanted to kill someone, because the statement was

---

[16] To the extent that Farmer argues the trial court erred by allowing Williams to testify because it was character evidence, this argument fails because the rule only excludes such evidence when used to prove conformity therewith. ER 404(a).

excluded as a prior bad act. However, the trial court admitted Farmer's statement about wanting to kill someone. Therefore, this claim is factually meritless and fails.

            c.        Introducing ER 404(b) evidence

Farmer argues that the prosecutor committed misconduct by introducing prior bad acts evidence that the trial court had excluded. Specifically, Farmer argues that evidence about him going to bars and picking up prostitutes was excluded and that the trial court acknowledged that such evidence was ER 404(b) evidence that was improperly introduced.

However, the trial court never excluded such evidence. The trial court only addressed the admission of Detective Miller's testimony regarding his interview of Farmer and Farmer's statements about patronizing prostitutes, and ruled that Farmer's statements to Detective Miller came in, but Detective Miller's opinion did not. And the trial court had otherwise excluded mention of Farmer riding and shooting at cars and his desertion from the military. Furthermore, the trial court did not say that the evidence was indeed ER 404(b) evidence that was improperly introduced. Rather, the trial court was only paraphrasing Farmer's argument for a new trial. Therefore, Farmer's claim is factually meritless and fails.

            d.        Eliciting false testimony

Farmer argues that the prosecutor committed misconduct when he "knowingly encouraged and allowed false testimony about [Titus's] California plea agreement." SAG at 4. During trial, the prosecutor elicited testimony from Titus that he did not enter into any formal plea agreement in either Washington or California. Titus also testified that he was offered no guarantees and Detective Miller testified that Titus never received immunity and there was no agreement at the time of trial. Therefore, this claim is factually meritless and fails.

e.      Vouching for witness credibility

Farmer argues that the prosecutor committed misconduct by vouching for Titus's credibility. We disagree.

A prosecutor commits misconduct by personally vouching for a witness's credibility or veracity. *State v. Ish*, 170 Wn.2d 189, 196, 241 P.3d 389 (2010). "Improper vouching generally occurs (1) if the prosecutor expresses his or her personal belief as to the veracity of the witness or (2) if the prosecutor indicates that evidence not presented at trial supports the witness's testimony." *Id*. However, a prosecutor "has wide latitude in closing argument to draw reasonable inferences from the evidence and may freely comment on witness credibility based on the evidence." *State v. Lewis*, 156 Wn. App. 230, 240, 233 P.3d 891 (2010). Closing argument does not constitute improper vouching unless it is clear that the prosecutor is not arguing an inference from the evidence, but instead is expressing a personal opinion on credibility. *Warren*, 165 Wn.2d at 30.

During trial, the prosecutor elicited testimony from Titus that what he told law enforcement and his testimony at trial was the truth. Farmer did not object. Eliciting this testimony did not constitute improper vouching because the prosecutor did not express a personal opinion about Titus's credibility. Furthermore, because Farmer did not object to the prosecutor's questioning and fails to show that the prosecutor's conduct was so flagrant and ill-intentioned that an instruction could not have cured any resulting prejudice, this claim of misconduct is waived. *Emery*, 174 Wn.2d at 760-61.

During closing arguments, the prosecutor stated that Titus could have worn a wire and discussed the incident if he wanted to help himself out. Farmer objected to this statement because no evidence had been presented about wearing a wire, but the trial court overruled. While Farmer

argues that the prosecutor's statement constituted improper vouching, he failed to object on this basis, and thus has waived this argument on appeal. RAP 2.5(a). Therefore, Farmer's claim fails.

             f.        Expressing personal opinion on guilt

Farmer argues that the prosecutor committed misconduct by expressing her personal opinion on Farmer's guilt. It is improper for a prosecutor to express a personal opinion of the defendant's guilt independent of the evidence. *State v. McKenzie*, 157 Wn.2d 44, 53, 134 P.3d 221 (2006). *See State v. Susan*, 152 Wash. 365, 379-80, 278 P. 149 (1929). Yet, if based on the evidence, prosecutors may make reasonable inferences in their arguments. *Fisher*, 165 Wn.2d at 747.

Here, during closing argument, the prosecutor said, "To the perpetrator, you carry that secret with you to the grave and that's what Brandon Farmer would have done." 8 VRP at 864. This statement was a comment on Farmer's guilt, but it was not independent of the evidence because Detective Miller testified that the case went cold until Titus came forward. Furthermore, Farmer did not object to this argument and does not show that the prosecutor's conduct was so flagrant and ill-intentioned that an instruction could not have cured any resulting prejudice. As a result, Farmer has also waived this argument. *Emery*, 174 Wn.2d at 760-61. Therefore, Farmer's claim fails.

             g.        Arguing Titus's testimony was consistent

Farmer argues that the prosecutor committed misconduct by arguing that Titus's testimony was consistent with that of the rest of the witnesses and that Farmer's testimony was inconsistent. A prosecutor may not mislead the jury by misstating the evidence. *Guizzotti*, 60 Wn. App. at 296.

But in the context of closing arguments, a prosecutor has wide latitude to make arguments to the jury and may draw reasonable inferences from the evidence. *Fisher*, 165 Wn.2d at 747.

During closing argument, the prosecutor argued that Titus's testimony was consistent throughout and consistent with the other witnesses' testimony. The prosecutor also argued that Farmer's testimony was inconsistent with itself and the other witnesses' testimony. The prosecutor argued that Farmer did not mention that there were two shots.

While Farmer argues that these arguments misstated the evidence, the prosecutor has wide latitude to make arguments during closing and drew reasonable inferences from the evidence here. First, Titus's testimony was consistent with the other witnesses who testified that there were two shots fired. Second, Farmer testified that he sold the .357 revolver to Titus, which was inconsistent with his testimony that Titus did not want to buy the gun. Farmer also testified that he never told Detective Miller "when Dusty pulled the gun out [he] thought [Titus] was going to shoot her so [he] ran over and pushed Dusty, and that's when the gun went off," while Detective Miller testified that Farmer did tell him that. 7 VRP at 792, 841. Furthermore, while Farmer did testify that there were two shots, Farmer did not object to the prosecutor's argument and does not argue that the prosecutor's conduct was so flagrant and ill-intentioned that an instruction could not have cured any resulting prejudice. As a result, Farmer also waived this argument. *Emery*, 174 Wn.2d at 760-61. Therefore, Farmer's claim fails.

        h.      Arguments not supported by evidence

Farmer argues that the prosecutor committed misconduct by making arguments not supported by the evidence and by inserting "herself as a witness" by arguing "you know exactly what I'm talking about." SAG at 6. A prosecutor commits misconduct by making arguments

unsupported by the admitted evidence. *Yates*, 177 Wn.2d at 58. Yet, in the context of closing arguments, a prosecutor has wide latitude to make arguments to the jury and may draw reasonable inferences from the evidence. *Fisher*, 165 Wn.2d at 747.

Here, the prosecutor argued during closing argument that a waistband tightens when a person's pants are pulled down and provided an example about being on a road trip or hike and having to use the restroom. The prosecutor concluded his example by saying, "[Y]ou know exactly what I'm talking about." 8 VRP at 868. Farmer did not object to this argument. This argument was a reasonable inference from the evidence provided regarding the pants that Farmer was wearing and him having to pull down those pants to receive oral sex from Tirado. And the prosecutor did not insert herself as a witness as the prosecutor provided the example as argument and has wide latitude to do so based on the evidence presented by Titus.

Furthermore, Farmer failed to object and fails to show that the prosecutor's conduct was so flagrant and ill-intentioned that an instruction could not have cured any resulting prejudice. As a result, Farmer has waived this argument. *Emery*, 174 Wn.2d at 760-61. Farmer's claim fails.

5. Judicial Misconduct

Farmer argues that the trial court committed misconduct by excluding any mention of the names of Titus's new felony convictions and the type of treatment that Titus was required to complete. However, this argument is addressed above and the trial court did not abuse its discretion. *See* Section C.1. Therefore, this claim fails.

6. Wells's Testimony

Farmer argues that Wells's testimony was inflammatory, flagrant, and intended to anger the jurors. However, Farmer did not object to this testimony. As a result, Farmer has failed to

preserve this claim for appellate review. RAP 2.5(a). Farmer also fails to argue the existence of a manifest error affecting a constitutional right. RAP 2.5(a)(3). Therefore, we do not address this claim.

7. Same or Similar Offense

Farmer makes an argument regarding a same or similar offense. While Farmer cites to the record, Farmer's mere description and quotation of the prosecutor's statements do not inform us of the nature and occurrence of the alleged errors. RAP 10.10(c). Therefore, we do not address this claim.

APPELLATE COSTS

Farmer argues that we should decline to impose appellate costs against him if the State substantially prevails on this appeal and makes a proper request. A commissioner of this court will determine the award of appellate costs under RAP 14.2, if the State files a cost bill and Farmer objects.

No. 48991-1-II

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Lee, J.

We concur:

_____
Johanson, J.

_____
Maxa, A.C.J.