IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Personal Restraint of: | ) | No. 40050-6-III |
| | ) | |
| TOMMY JOEL P. QUIROZ, | ) | UNPUBLISHED OPINION |
| | ) | |
| Petitioner. | ) | |

MURPHY, J. — Tommy Quiroz seeks relief from personal restraint imposed following his 2020 convictions for second degree attempted rape of a child and communication with a minor for immoral purposes. We deny the petition.

FACTS

In December 2018, the Washington State Patrol (WSP) Missing and Exploited Children Task Force (MECTF)[1] conducted what is commonly referred to as a "Net Nanny" operation in Kittitas County. Clerk's Papers (CP) at 215-19. The operation sought to identify and arrest those individuals who responded to offers to engage in sex with children and then took one or more substantial steps to meet the child. Quiroz was

---

[1] This task force "spearheads multi-agency operations, including federal, state, and local law enforcement, aimed at finding and recovering sexually exploited children and apprehending child predators." WASH. STATE PATROL, MISSING & EXPLOITED CHILD. TASK FORCE, https://wsp.wa.gov/crime/mectf/ (last visited May 11, 2026); *see also* RCW 13.60.100-.110.

apprehended in a Net Nanny operation in Ellensburg and charged with one count of

second degree attempted rape of a child and one count of communication with a minor

for immoral purposes.

Following a three-day jury trial in September 2020, Quiroz was found guilty as

charged. In December 2020, he was sentenced to 80 months to life in prison on the

second degree attempted rape of a child conviction and 12 months on the communication

of a minor for immoral purposes conviction. Quiroz also received lifetime community

custody on the attempted rape conviction and 12 months community custody on the

communication for immoral purposes conviction.

Quiroz appealed from his judgment and sentence and this court affirmed.

*State v. Quiroz*, No. 37911-6-III (Wash. Ct. App. Jan. 25, 2022) (unpublished),

https://www.courts.wa.gov/opinions/pdf/379116_unp.pdf. On July 19, 2022, after the

Supreme Court denied Quiroz's petition for review of this court's decision, the case was

mandated back to the trial court.

On July 13, 2023, Quiroz timely filed in the trial court a CrR 7.8.motion for relief

from judgment. Quiroz asked the trial court to direct the State to respond to his motion,

hold an evidentiary hearing, vacate his judgment and sentence, and order a new trial.

He alternatively requested a new sentencing hearing.

2

Quiroz asserted in his CrR 7.8 motion that he was denied due process and the right to counsel at trial based on the following: (1) ineffective assistance of counsel, (2) prosecutorial misconduct, (3) knowingly false testimony by a State witness, and (4) a *Brady*[2] violation. After reviewing Quiroz's motion and the other submissions of the parties, the trial court concluded that the Court of Appeals was in the best position to address these claims of error. It transfer Quiroz's motion to this court under CrR 7.8(c)(2) to be considered as a personal restraint petition.

## ANALYSIS

To obtain relief in a personal restraint petition (PRP), a petitioner must show either (1) constitutional error resulting in actual or substantial prejudice or (2) nonconstitutional error leading to a fundamental defect that inherently resulted in a complete miscarriage of justice. *In re Pers. Restraint of Woods*, 154 Wn.2d 400, 409, 114 P.3d 607 (2005), *overruled in part on other grounds by Carey v. Musladin*, 549 U.S. 70, 127 S. Ct. 649, 166 L. Ed. 2d 482 (2006).

### 1.    *Ineffective assistance of counsel*

Quiroz identifies five instances of ineffective assistance by his trial counsel. Our review is de novo, and we apply the same prejudice standard to this claim as we would

---

[2] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

on a direct appeal. *In re Pers. Restraint of Lui*, 188 Wn.2d 525, 538, 397 P.3d 90 (2017).

To prevail on an ineffective assistance of counsel claim, a defendant must show that:

(1) their counsel's performance was deficient by falling below an objective standard of

reasonableness based on consideration of all the circumstances, and (2) the deficient

conduct resulted in prejudice such that, but for counsel's poor performance, there is a

reasonable possibility the outcome of the proceedings would have been different. *State v.*

*McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995); *Strickland v. Washington*,

466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). "The burden is on the

defendant alleging ineffective assistance of counsel to show deficient representation."

*State v. Classen*, 4 Wn. App. 2d 520, 535, 422 P.3d 489 (2018). "[G]iven the deference

afforded to decisions of defense counsel in the course of representation," Quiroz must

overcome "'a strong presumption that counsel's performance was reasonable.'" *State v.*

*Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011) (quoting *State v. Kyllo*, 166 Wn.2d 856,

862, 215 P.3d 177 (2009)). Conduct based on legitimate trial strategy or tactics does not

constitute deficient performance. *Id*. "We need not consider both prongs of *Strickland*

(deficient performance and prejudice) if a petitioner fails on one." *In re Pers. Restraint*

*of Crace*, 174 Wn.2d 835, 847, 280 P.3d 1102 (2012).

4

### 1.1  Criminal profile testimony

First, Quiroz argues trial counsel was deficient when no objection was raised to a detective's testimony on Net Nanny operations in general, claiming this was improper "profile" evidence implying Quiroz fit a certain perpetrator type. At trial, the detective testified he was part of the MECTF unit which started in 1999. The detective explained that proactive operations, such as Net Nanny, are attempts to identify persons with a "sexual attraction to" or "a sexual interest in children." CP at 214-15. The detective described the purpose of operations like this is "to identify people before they actually go hands-on," but that many times identified persons "have already been hands-on." CP at 216.

The detective testified about the safeguards in place for undercover officers who arrest the people arriving at the trap houses, noting some people have shown up with firearms. He explained there is a special arrest team trained in offsite take-downs to address the potential dangers, such as when officers discover the person they expect at the house has an extensive criminal and/or violent background.

The detective also testified in general terms about the Net Nanny operation that was set up in Ellensburg. He discussed the process of setting up the operation, including establishing "chatters," who create fictitious personas:

5

> All the chatters that we identify and that we use, they're all highly trained, they all have been through the—the ICAC which is internet crimes against children, the basic class and the undercover chat school. So during the school they learn how to chat in a way where—it's through the ICAC standards so there's—there's no entrapment; it's—they're—they are directed to chat in a very specific manner—to identify the real people that—that have the sexual interest in children.

CP at 221. The detective emphasized that the purpose of a Net Nanny operation is "to chat with, identify and investigate people who are online that actively trying to seek sexual contact with children." CP at 228.

While this detective was involved in the Ellensburg Net Nanny operation, he had no personal knowledge of Quiroz's case and confirmed that he had not read the chats between the "chatter" and Quiroz.

Quiroz maintains the above recounted testimony was improper "profile" testimony, and his trial counsel was ineffective for failing to object. As a general rule, perpetrator profile testimony is improper because it carries with it the "implied opinion that the defendant is the sort of person who would engage in the alleged act, and therefore did it in *this* case too." *State v. Braham*, 67 Wn. App. 930, 939 n.6, 841 P.2d 785 (1992). Nothing in the rules of evidence, however, explicitly states profile testimony is inadmissible, although it may raise concerns under ER 402, ER 403, ER 404(a), and ER 702. *State v. Crow*, 8 Wn. App. 2d 480, 495-96, 438 P.3d 541 (2019). Quiroz neither

analyzes the allegedly improper testimony of the detective under any rule of evidence nor otherwise explains how the detective's testimony constituted improper profile testimony. Instead, Quiroz broadly asserts that it was improper and should have resulted in an objection being raised by his counsel. Bald assertions and conclusory allegations are insufficient to warrant relief. *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 885-86, 828 P.2d 1086 (1992). The detective's testimony provided context for the Net Nanny operation, not a profile of Quiroz. Trial counsel's decision to not object may have been tactical to avoid placing emphasis on the testimony. Even if deficient, however, Quiroz has not shown prejudice given the overwhelming evidence of his communications and actions.

### 1.2 Voluntariness of the apology letter

Second, Quiroz claims defense counsel was deficient for not challenging the voluntariness of a post-arrest apology letter he authored. Quiroz asserts the letter he wrote was the result of an involuntary confession that violated his constitutional right to be free from self-incrimination. We disagree with Quiroz's characterization of the letter.

The admission at trial of a defendant's involuntary confession violates both the Fifth Amendment to the United States Constitution and article I, section 9 of the

Washington State Constitution. *State v. Unga*, 165 Wn.2d 95, 100, 196 P.3d 645 (2008).[3]

"Because the Fifth Amendment protects a person from being compelled to give evidence against [themselves], the question whether admission of a confession constituted a violation of the Fifth Amendment does not depend solely on whether the confession was voluntary; rather, 'coercive police activity is necessary predicate to the finding that a confession is not voluntary.'" *Id.* at 100-01 (some internal quotation marks omitted) (quoting *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986)). The totality of the circumstances is considered when determining whether any custodial statements made by a defendant are admissible. *Id.* Factors to be considered include: "the 'crucial element of police coercion'; the length of the interrogation; its location; its continuity; the defendant's maturity, education, physical condition, and mental health; and whether the police advised the defendant of the rights to remain silent and to have counsel present during custodial interrogation." *Id*. (quoting *Withrow v. Williams*, 507 U.S. 680, 693-94, 113 S. Ct. 1745, 123 L. Ed. 2d 407 (1993)).

This is juxtaposed against permissible police utilization of "psychological ploys" that played a part in an individual's decision to confess but do not render the confession

---

[3] The protection afforded under article I, section 9 is "coextensive with that provided by the Fifth Amendment." *Id*.

involuntary "'so long as that decision is a product of the suspect's own balancing of competing considerations. . . . The question . . . [is] whether [the interrogating officer's] statements were so manipulative or coercive that they deprived [the suspect] of his ability to make an unconstrained, autonomous decision to confess.'" *Id*. (alterations in original) (citations omitted) (quoting *Miller v. Fenton*, 796 F.2d 598, 605 (3d Cir. 1986)).

Following his arrest, Quiroz was Mirandized and interrogated by a police officer and task force officer for approximately 55 minutes. During that interaction, Quiroz told the officers he came to Ellensburg to "hook up with a woman" named "Amanda" who he had been texting. CP at 439, 441. Although Amanda's profile said she was 22 or 23 years old, Quiroz admitted Amanda had told him she was 13, and he asked for naked pictures of her.

Quiroz was questioned about his sexual interests, including whether he was attracted to children. The officer told Quiroz his job was to assess whether Quiroz was a "monster" or an "opportunist." CP at 456. Quiroz admitted he made a "stupid decision" because he was "desperate" and had not had a girlfriend in a long time. CP at 457. He said he was enticed by Amanda's persistence. The officer accused Quiroz of planning to have sex with a 13-year-old. The officer pushed that "had there not been officers in that house you would have had sex with that girl." CP at 471. Through additional questioning,

9

Quiroz agreed he was sorry. The officer created an opportunity for Quiroz to write an apology letter by leaving him with a pad of paper and something to write with.

Quiroz wrote an apology letter to his friends, telling them the "Amanda" they had given him a ride to come see was 13 years old and he "was going to have sex with her." CP at 476. He also wrote, "I'm sorry I ever asked you for a ride, and I didn't tell you that the girl Amanda was a minor, even though I knew in my heart and in my soul it was wrong." CP at 476.

Quiroz's counsel did not move to suppress any of Quiroz's custodial statements, including the apology letter, and did not object to their admission at trial. Quiroz's recorded custodial interview was played for the jury and his apology letter was read to jurors during the testimony of the detective who interviewed Quiroz.

Quiroz asserts that he was subjected to a protracted interrogation in which he was accused of being a monster and pressured into admitting he intended to have sex with a minor. He points to his trial testimony in which he stated (1) a belief that he had been communicating with a woman in her twenties, and (2) he had felt pressured and intimidated during his custodial interrogation to write the apology letter. In a declaration submitted in support of his PRP, Quiroz states he agreed to talk to the police because he thought "things would be easier" if he did. CP at 607. Quiroz also declared that the

detective told him "that writing [the apology] letter would help" him and Quiroz thought that if he didn't write the letter the police "would find some other way to make [his] life hell . . . and it would be worse for [him] if [he] didn't go ahead and write something." CP at 607. Quiroz's sister also submitted a declaration and recounted how Quiroz had a history of trauma, neglect, abuse, and a potential head injury. Finally, Quiroz also relies on statements made by his defense counsel during sentencing on how Quiroz was depressed, had suicidal ideation, and "seem[ed] to be a man—somewhat limited IQ, struggling—to remember, discuss details of his life." *Id.* at 593, 600.

The totality of the circumstances do not lead to the conclusion that coercion resulted in an involuntary confession. Pressure from an officer does not equate with coercion. Here, Quiroz considered and weighed his responses to law enforcement. He balanced the competing considerations when he chose to confess and write the letter of apology. The record does not indicate Quiroz's will was overwrought by words or acts of law enforcement. Quiroz's attempt to argue otherwise through an after-the-fact declaration is unpersuasive. And his mere assertion of a causal connection between the officer's questioning and his confession is insufficient to show coercion. Moreover, the statements from trial counsel during sentencing and in the declaration from Quiroz's sister hypothesizing about potential limits in Quiroz's mental capacity are insufficient to

show Quiroz's decision to confess was not a product of his own decision-making because they simply assert that he might have mental deficiencies.

Quiroz also asserts that, to the extent further investigation was required to demonstrate whether or not his statements were voluntary, including the assistance of an expert, his defense counsel was deficient in not conducting such investigation. In making this assertion, Quiroz does not outline the specifics of such an investigation, nor does he provide any evidence showing what would have been found had an actual investigation occurred. "Bald assertions and conclusory allegations" do not entitle a petitioner to relief. *Rice*, 118 Wn.2d at 886.

### 1.3    Redaction of words used in interrogation

Third, Quiroz argues defense counsel should have sought redaction of the officer's references to the use of the word "monster" as improper opinion testimony on guilt. "Generally, no witness may offer testimony in the form of an opinion regarding the guilt or veracity of the defendant; such testimony is unfairly prejudicial to the defendant 'because it invad[es] the exclusive province of the [jury].'" *State v. Demery*, 144 Wn.2d 753, 759, 30 P.3d 1278 (2001) (plurality opinion) (alterations in original) (some internal quotation marks omitted) (quoting *City of Seattle v. Heatley*, 70 Wn. App. 573, 577, 854 P.2d 658 (1993)).

Even assuming that the conduct of defense counsel could be characterized as deficient, Quiroz has failed to establish prejudice. The statements Quiroz claims should have been redacted were made as part of the custodial interrogation. This was not trial testimony offering an opinion on guilt.[4]

### 1.4 Entrapment defense jury instruction

Fourth, Quiroz contends defense counsel was ineffective for not requesting the court instruct the jury on the affirmative defense of entrapment. Our Supreme Court has held "that to obtain an entrapment instruction, defendants must make a prima facie showing that (1) the crime originated in the mind of the police or an informant and (2) the defendant is induced to commit a crime that [they were] not predisposed to commit." *State v. Arbogast*, 199 Wn.2d 356, 360, 506 P.3d 1238 (2022) (citing RCW 9A.16.070(1)).

During the jury instruction conference, defense counsel told the court his "advice to [Quiroz] is probably not going to be to assert . . . entrapment," but he was going to discuss that with his client. CP at 513-14. The following day, defense counsel informed the court "my client will not assert an entrapment defense, and he will testify." CP at 518.

---

[4] In fact, defense counsel used these statements to argue that Quiroz was pressured into confessing as a result of police overreach.

"An affirmative defense admits the defendant committed a criminal act but pleads an excuse for doing so. The defendant must prove an affirmative defense by a preponderance of the evidence." *State v. Fry*, 168 Wn.2d 1, 7, 228 P.3d 1 (2010) (citations omitted). An affirmative defense of entrapment would have required Quiroz to admit that he believed the fictitious victim, "Amanda," was less than fourteen years old. *State v. Johnson*, 173 Wn.2d 895, 908, 270 P.3d 591 (2012) ("[I]t is clear that the age of the victim of child rape—either the child victim's actual age or the defendant's belief in a fictitious age—is material to proving the specific intent element of attempted child rape."). Quiroz later testified he believed "Amanda" was at least 22 years old. Had defense counsel requested and argued for an instruction on the affirmative defense of entrapment, this would have contradicted Quiroz's testimony. It was reasonable for defense counsel to not request an entrapment instruction as it would have undermined Quiroz's testimony and the defense case theory that Quiroz thought that he was communicating with someone who was "22 to 23 years old," and that he did not believe "Amanda" when she told him she was 13 years old." CP at 528-29.

### 1.5 Psychosexual assessment

Fifth, Quiroz argues trial counsel was ineffective for failing to obtain a psychosexual assessment showing Quiroz was not dangerous. In making this argument,

Quiroz does not support this claim with any evidence demonstrating what such an assessment would have revealed. Bald assertions and conclusory allegations are insufficient to command review by this court. *Rice*, 118 Wn.2d at 886. "[A] petitioner must state with particularity facts which, if proven, would entitle [them] to relief. *Id*.

## 2.     *Prosecutorial misconduct*

Quiroz contends the trial court erred in allowing the State to argue that online child sexual abuse is a societal ill, and link solving that societal ill to Quiroz's case. His argument is framed in the context of prosecutorial misconduct in that the State made comments to inflame the passions of the jury, depriving Quiroz of a fair trial.

To provide context to Quiroz's argument, at trial, the State called as a witness the detective who interviewed Quiroz following his arrest. The following exchange occurred on that detective's direct examination:

> Q   How big a problem is internet crimes against children in our society.
> A   I think it's growing at an alarming rate. We've seen—just an uptick in— the identification of cases . . .—if I mentioned a type of case, a cyber-tip case, which—case that would be generated by an internet service provider that identifies—nefarious activity, whether either an image of child exploitation or a video of child exploitation is being posted—in sites, just that industry alone has increased—well over 100 percent year by year just since I've been part of the [t]ask force.
> Q   What about places like—Ellensburg, small rural communities, where— we don't—we don't think that we have this kind of problem. Do you see (inaudible) Ellensburg?

    A  Absolutely. I mean these—these cases are ubiquitous. I mean it's everywhere.

    Q  How important is proactive policing (inaudible).

    A  We have found—And to be fair, the task force that I'm a part of, which is multi—

          [DEFENSE COUNSEL]: Objection. There's no evidentiary value—testimony. It's all trying to sway the jury.

          THE COURT [to PROSECUTOR]: [C]an you move on?

CP at 423.[5]

The trial court's instructions to the jury included the following:

> The lawyers' remarks, statements and arguments are intended to help you understand the evidence and apply the law. It is important, however, for you to remember that the lawyers' statements are not evidence. The evidence is the testimony and the exhibits. The law is contained in my instructions to you. You must disregard any remark, statement or argument that is not supported by the evidence or the law in my instructions.

CP at 545.

---

[5] In a footnote in his petition, Quiroz contends his trial counsel was ineffective for failing to object to the detective's "irrelevant and inflammatory" testimony regarding the extent internet crimes against children presents as a problem in society at large and, specifically, in small rural communities like Ellensburg. PRP at 22 n.6. However, defense counsel did object, arguing the testimony was offered to "try[] to sway the jury." CP at 423. The trial court asked the prosecution to move on from that line of questioning. This successful objection by Quiroz's counsel was effective representation.

During closing argument, the prosecution reminded the jury of this instruction,

and stated:

> And my argument today is intended to highlight how and why the evidence applies to the law in this case. As the judge indicated, my words aren't the evidence. You've heard the evidence, you've seen the evidence. —argument is intended to assist you in applying the law to the facts (inaudible) present.
>
> So the three elements. First, on or about December 17th,—2018 the defendant did an act that was a substantial step toward the commission of rape—child in the second degree. —something the defendant did moved him towards committing an offense. And there are several instructions that are illustrative on this point that you have in your packet (inaudible) read to you. I'm going to talk about a couple of them, but what I want to highlight—the beginning is—the fact that he never could have committed this offense, it was factually impossible, because there actually wasn't a 13-year-old girl, that's not a defense to the crime. —the proactive (inaudible) policing that was done in this kind of case is allowed, under the laws of the state of Washington for this exact reason, that people who may prey on children online (inaudible)—be a difficult crime to detect (inaudible) and is based on the word of a child. So rather than waiting for kids to be victimized,—
>
> [DEFENSE COUNSEL]: Objection. Judge this should only be about this case, not kids that are victimized or any overall scheme.
>
> THE COURT: Thank you . . . .
>
> Please continue . . . .
>
> [PROSECUTOR]: Thank you.
>
> —(inaudible) why the law exists, that factual or legal impossibility is not a defense, is because proactive policing (inaudible) important—keep crimes from happening.

17

CP at 554-55.[6]

To establish prosecutorial misconduct on review, an objecting defendant must show that the prosecutor's conduct was "'both improper and prejudicial in the context of the entire trial.'" *State v. Loughbom*, 196 Wn.2d 64, 70, 470 P.3d 499 (2020) (quoting *State v. Walker*, 182 Wn.2d 463, 477, 341 P.3d 976 (2015)). To show prejudice, the defendant must show a substantial likelihood the misconduct affected the jury verdict. *State v. Thorgerson*, 172 Wn.2d 438, 442-43, 258 P.3d 43 (2011). An alleged improper remark by a prosecutor is not reviewed in isolation, "but in the context of the total argument, the issues in the case, the evidence, and the instructions given to the jury." *State v. Warren*, 165 Wn.2d 17, 28, 195 P.3d 940 (2008). However, when a defendant fails to object at trial, "the defendant must also show 'that the misconduct was so flagrant

---

[6] In another footnote in his petition, Quiroz raised the claim of ineffective assistance of counsel in the context that the trial court, "after argument," incorrectly stated it sustained defense counsel's objection to the prosecution's closing remarks discussing the broader purpose for the policing done in this case. PRP at 23 n.7. Quiroz contends that, "[t]o the extent defense counsel had an obligation to point this out, ask for a curative instruction, or move for mistrial, his counsel's failure to do so was deficient performance and constituted ineffective assistance of counsel." PRP at 23 n.7. However, the portion of the record that Quiroz quotes from to support this argument, CP at 515 (RP (Sept. 2, 2020 at 440)), occurred at a jury instruction conference the day before closing argument. It is unclear from our review of the record whether the trial court sustained or overruled defense counsel's objection during closing argument. In any event, the prosecutor moved on from this portion of their argument shortly after the objection was made.

and ill intentioned that an instruction would not have cured the prejudice.'" *Walker*, 182 Wn.2d at 477-78 (quoting *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012)).

Here, defense counsel objected both to the detective's testimony on the proactive nature of Net Nanny operations and the related statements made by the prosecutor during closing argument. Contrary to Quiroz's assertions in his petition, defense counsel did object to the detective's direct testimony on the basis that there was no "evidentiary value" to the testimony, with counsel arguing, "It's all trying to sway the jury." CP at 423. Quiroz agrees that his defense counsel objected when the prosecutor revisited this subject during closing. Because defense counsel timely objected to both instances of alleged misconduct, the "flagrant and ill intentioned" standard does not apply. *Glasmann*, 175 Wn.2d at 704.

"Justice can be secured only when a conviction is based on specific evidence in an individual case and not on rhetoric. We do not convict to make an example of the accused, we do not convict by appeal to a popular cause, and we do not convict by tying a prosecution to a global campaign . . . ." *Loughbom*, 196 Wn.2d at 69-70 "'The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.'" *Glasmann*, 175 Wn.2d at 704 (quoting AM. BAR ASS'N, STANDARDS FOR CRIMINAL

JUSTICE std. 3-5.8(c) (2d ed. 1980)).

Here, the challenged line of questioning and closing argument, when viewed in the context of the record and the circumstances of the trial, do not demonstrate Quiroz was prejudiced. The prosecution did not repeatedly frame the case as addressing a broader social cause, nor was the jury urged to convict Quiroz to remedy a societal ill. Rather, the prosecution highlighted the purpose and benefits of proactive policing to explain why the defense of factual impossibility did not have merit, and to counter the claim that the jury should not acquit based on a fictious belief. After the objection by Quiroz's counsel, the prosecution continued its closing statement by outlining each element of both charged crimes, and laid out the evidence that supported each element of the crimes, reminding the jury of Quiroz's own words that he intended to have sex with a 13-year-old girl, and describing the substantial step Quiroz took to meet with and have sex with a 13-year-old girl.

Quiroz also argues an e-mail exchange that occurred between prosecutors about posttrial discussions with the jury demonstrates he was prejudiced. In the e-mail exchange, a prosecutor noted "[t]he jury was VERY positive when [the prosecution] spoke to them after deliberations. They were glad for this kind of policing and think it's essential in the world of the internet to keep kids safe." CP at 783; *see also* CP at 784-93.

Quiroz contends this "is a clear indication that the jury was swayed by the appeal to their passions, and specifically, by the appeal that the MECTF investigative methods are a righteous path to eradicating the scourge of online (and in-person) child sex abuse." PRP at 23. This e-mail exchange does not establish the jury convicted Quiroz on an improper basis. Quiroz has not met his burden of showing there is a substantial likelihood that any claimed misconduct was so pervasive that it unfairly affected the verdict.

## 3.     *Knowingly false testimony*

Quiroz also claims he is entitled to relief because the State obtained its conviction using knowingly false testimony. He claims a *New York Times Magazine* article, published just prior to his trial, contains statements that contradict the testimony provided by one of the testifying detectives regarding Net Nanny operations.[7] Quiroz cites to this article, and an e-mail sent from the prosecutor in this case that contained a link to the article. Quiroz contends this showed the State was aware of the article prior to trial, and knowingly elicited false testimony about Net Nanny operations from a testifying detective.

---

[7] Michael Winerip, *Convicted of Sex Crimes, But With No Victims*, N.Y. TIMES MAGAZINE (Aug. 26, 2020), https://www.nytimes.com/2020/08/26/magazine/sex-offender-operation-net-nanny.html (last visited May 11, 2026). CP at 609-21.

A prosecutor "must function within boundaries" while seeking justice because the prosecutor "owes a duty to defendants to see that their rights to a constitutionally fair trial are not violated." *State v. Monday*, 171 Wn.2d 667, 676, 257 P.3d 551 (2011). A prosecutor "may not knowingly use false evidence, including false testimony, to obtain a tainted conviction." *Napue v. Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959). "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id*.

A petitioner must support their claim with competent and admissible evidence. *In re Pers. Restraint of Cook*, 114 Wn.2d 802, 813-14, 792 P.2d 506 (1990). Newspaper articles are generally considered hearsay. *State v. Low*, 192 Wash. 631, 635, 74 P.2d 458 (1937); ER 801(c). Because it is hearsay, the *New York Times Magazine* article is not competent and admissible evidence and therefore insufficient to support his claim that the State knowingly used false testimony to obtain his conviction. *Rice*, 118 Wn.2d at 886.

Quiroz also relies on a report from the Washington State Institute of Public Policy that he claims also contradicts the detective's testimony. However, this report was published in June 2023, after Quiroz's trial. Therefore, this report cannot be relied upon to show the State knowingly presented false testimony during Quiroz's trial.

Quiroz fails to show the State knowingly elicited false testimony to obtain his conviction.

4.    <u>*Brady* violation and witness substitution</u>

Quiroz asserts a *Brady* violation, claiming the prosecutor failed to disclose impeachment evidence and manufactured a last-minute witness substitution.

By way of additional background, on the first day of trial, the State stated it would be substituting one of the detectives who would be testifying at trial. The detective to be substituted was not on the State's witness list. Defense counsel objected, stating he prepared cross-examination of the detective on the State's witness list, not the detective who was to be substituted. The State responded that the detective on the witness list retired from the WSP. The trial court noted that retirement did not preclude the listed detective from testifying. The State agreed, but argued the substituting detective would only be testifying to general facts of Net Nanny operations, not the specific facts of Quiroz's case. The trial court allowed the witness substitution, with the caveat that defense counsel be allowed time to meet with the substituted detective before that detective testified.

Quiroz contends that e-mails produced from a public records request show that the State was aware of the detective's retirement long before trial, and that the retiring

detective confirmed an ongoing availability to serve as a witness for the prosecution once retired. He claims this "raises a question of the reasoning behind the State's eleventh-hour decision to take [the retiring detective] off the State's witness list and substitute [another detective] in his place." PRP at 14.

The *Brady* violation claimed by Quiroz is related to the retired detective's history of working for the MECTF and the detective's relationship with an organization called Operation Underground Railroad (OUR). Quiroz asserts a "mutually-beneficial financial relationship" between MECTF and OUR, PRP at 14, as documented in a 2020 *New York Times Magazine* article and the declaration and supporting documents of an investigator retained by Quiroz. Quiroz alleged the retired detective not only obtained a substantial amount of money from OUR for MECTF, but also worked at OUR after leaving the WSP. Additionally, Quiroz cites unrelated cases in which he alleges the retired detective failed to preserve or lost evidence. Quiroz claims this impeachment information was not disclosed to his defense counsel, and this constituted *Brady* violations. Quiroz maintains the State's decision to not call the retired detective surely benefitted the State.

Due process requires the State to disclose evidence that is both favorable to the defendant and material to guilt or punishment. *Brady*, 373 U.S. at 87. "In order to establish a *Brady* violation, a defendant must establish three things: (1) '[t]he evidence at

24

issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching,' (2) 'th[e] evidence must have been suppressed by the State, either willfully or inadvertently,' and (3) the evidence must be material." *State v. Davila*, 184 Wn.2d 55, 69, 357 P.3d 636 (2015) (alterations in original) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999)). To demonstrate prejudice, the key question "'is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence [they] received a fair trial . . . resulting in a verdict worthy of confidence.'" *Strickler*, 527 U.S. at 289-90 (quoting *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995)).

To the extent Quiroz argues a *Brady* violation was a result of the State not disclosing impeachment evidence related to the retired detective, Quiroz does not show that the evidence was material since this retired detective did not testify at Quiroz's trial. To the extent Quiroz argues the trial court erred in allowing the witness substitution, he fails to show actual and substantial prejudice resulting from the claimed error.

Quiroz attempts to argue the jury might have felt differently about Net Nanny operations, and about those who conducted these operations, if the impeachment evidence related to the retired detective had been produced at trial. However, how jurors may have felt about Net Nanny operations was not a factor in the verdict. The jury was

instructed on the elements of attempted second degree rape of a child. The presumption is

that the jury followed the instructions. *State v. Kalebaugh*, 183 Wn.2d 578, 586, 355 P.3d

253 (2015).

The substitution involved a witness testifying to general operations, not to case-

specific facts. The trial court did not abuse its discretion in allowing the change.

CONCLUSION

Quiroz fails to demonstrate constitutional error causing actual prejudice or a

fundamental defect resulting in miscarriage of justice. We deny the petition as he has not

shown he is under unlawful restraint.

A majority of the panel has determined this opinion will not be printed in

the Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____

Murphy, J.

WE CONCUR:

_____                    _____

Staab, C.J.                                        Cooney, J.

26